# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-2279

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID C. BROCK,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 02 CR 79—**Larry J. McKinney**, *Chief Judge.*

———————

ARGUED APRIL 8, 2005—DECIDED AUGUST 2, 2005

———————

Before FLAUM, *Chief Judge*, and BAUER and WOOD, *Circuit Judges.*

FLAUM, *Chief Judge.* A federal jury convicted defendant-appellant David C. Brock of several counts of possessing with intent to distribute large quantities of narcotics and being a felon in possession of a firearm. Brock appeals his conviction and his 360-month sentence. For the reasons that follow, we affirm the conviction and order a limited remand of Brock's sentence pursuant to our decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I.  Background

On April 9, 2002, a team of federal and state law enforcement officers executed a federal search warrant at defendant's residence, 3375 Payton Avenue in Indianapolis, Indiana ("3375"). The officers conducted a thorough search of the home and, over several hours, recovered evidence including cocaine, methamphetamine, marijuana, $35,000 in cash, numerous loaded firearms, and ammunition. Brock was not present during the search, but three individuals were found in the home who identified themselves as Reginald Godsey, Kelly Knox, and Steven Hayden. Indianapolis police officer David Miller placed handcuffs on these individuals, and after informing them of their *Miranda* rights, proceeded to question them. Godsey told police that he lived next door at 3381 Payton Avenue ("3381"), and that he watched over both houses. He gave the police a key to 3381 and consented to a search of the common areas of that residence.

Godsey also informed police that Brock rented a room at 3381, which he used as a "stash house." According to Godsey, Brock transported methamphetamine between 3381 and 3375 using a silver suitcase and was storing 16 to 17 pounds of methamphetamine inside a safe in his room at 3381. Police had recovered a silver suitcase during the search of 3375.

After receiving this information from Godsey, Officer Miller returned to the office to prepare an affidavit and obtain a search warrant for the entire 3381 residence. Other officers entered 3381 through the rear door using Godsey's key. The house at 3381 Payton Avenue consisted of a kitchen, a living room, and three separate locked bedrooms. The police found a shotgun in plain view in the living room. Godsey provided a key to his bedroom and authorized police to search it. Officers found in Godsey's room a small amount of narcotics consistent with personal

use. Another bedroom in the southwest corner of the residence had a pile of clothes directly in front of the locked door and a sign on the door stating: "Stay Out. David." Officer Ron Mills, a canine officer with the Indianapolis police department, was called to 3381 with Yoba, his drug-sniffing dog, to corroborate the presence of narcotics. The dog alerted to the presence of narcotics while sniffing just outside Brock's locked bedroom.

Officer Miller prepared an affidavit in which he detailed all of the evidence recovered from 3375, including utility bills for the 3381 residence in Brock's name. Miller also included in the affidavit the information provided by Godsey as well as the dog's alert to the southwest bedroom of 3381. Based on that evidence, a judge issued a search warrant authorizing a search of 3381 and seizure of "Methamphetamine, Cocaine, an extract of Coca, Marijuana, Cannabis, all monies, papers, records, documents, electronic information, or any other documentation which indicates or tends to indicate a violation or a conspiracy to violate the Indiana Controlled Substance Act." When Officer Miller returned with the search warrant, police forcibly entered the southwest bedroom. They recovered several firearms from inside a closet, an ammunition box labeled "David Brock," and a safe, which the officers forcibly opened to find seventeen pounds of methamphetamine and one pound of cocaine. Godsey, Hayden, and Knox all denied ownership of the drugs and weapons seized from both residences. They were released and were not charged in connection with this case.

Brock was indicted on six counts: two counts of possession with intent to distribute 500 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1); two counts of possession with intent to distribute cocaine (500 grams and an unspecified amount) in violation of 21 U.S.C. § 841(a)(1); and two counts of being a felon in possession of numerous firearms and ammunition in violation of 18 U.S.C. § 922(g)(1).

Prior to trial, defendant moved to suppress the evidence recovered from 3381 on the grounds that the dog sniff was an illegal warrantless search and the search warrant was not otherwise supported by probable cause. The district court denied the motion following a hearing, and Brock proceeded to trial.

At trial, the government introduced the evidence seized during the searches of 3375 and 3381, including 8.42 kilograms of methamphetamine, 1.037 kilograms of cocaine, and 21 firearms. The government also presented two witnesses, Joel Dyer and Scott Lewis, who testified that they had engaged in additional methamphetamine transactions with Brock at the 3375 residence. The jury convicted Brock on all six counts.

## II.  Discussion

In this appeal, Brock contends that the district court erred in denying his motion to suppress, arguing that the warrantless dog sniff inside his home violated the Fourth Amendment. Brock also challenges several rulings made by the district court during the course of his trial. Finally, Brock contests his sentence and seeks a *Paladino* remand. We address each argument in turn.

### A.  Motion to Suppress

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. With few exceptions, the Fourth Amendment prohibits the warrantless entry of a person's home to make an arrest or conduct a search. *Kyllo v. United States*, 533 U.S. 27, 31 (2001); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Payton v. New York*, 445 U.S. 573, 586 (1980). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also Kyllo*, 533 U.S. at 33 (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)) (a Fourth Amendment search of a home does not occur "unless the individual manifested a subjective expectation of privacy in the object of the challenged search and society is willing to recognize that expectation as reasonable").

Brock contends that the canine sniff outside his locked bedroom door constituted an illegal warrantless search, and that the warrant to search 3381, which was issued in reliance on that sniff, violated the federal and Indiana Constitutions. The government argues that the dog sniff was not a search at all because the police were lawfully present inside Brock's residence with Godsey's consent, and Brock possessed no reasonable expectation that his drugs would go undetected.

At oral argument, the government relied primarily on the Supreme Court's recent decision in *Illinois v. Caballes*, 125 S. Ct. 834 (2005), issued after the parties submitted their briefs in this case. The Court held in *Caballes* that a dog sniff of a vehicle during a traffic stop, conducted absent reasonable suspicion of illegal drug activity, did not violate the Fourth Amendment because it did not implicate any legitimate privacy interest. *Id.* at 837-38. The Court explained that, because there is no legitimate interest in possessing contraband, the use of a well-trained narcotics-detection dog that "*only* reveals the possession of narcotics 'compromises no legitimate privacy interest'" and does not violate the Fourth Amendment. *Id.* (quoting *Jacobsen*, 466 U.S. at 123).

*Caballes* relied on the Court's opinion in *United States v. Place*, 462 U.S. 696 (1983), which held that a canine sniff of a traveler's luggage in the airport was not a search within the meaning of the Fourth Amendment because the information obtained through this investigative technique revealed only the presence or absence of narcotics. As the Court explained,

> the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure.

*Id.* at 707. Adhering to this reasoning, the Court held in *Jacobsen* that a chemical field test of a substance found inside a package was not a Fourth Amendment search because the test "merely discloses whether or not a particular substance is cocaine." 466 U.S. at 123. As there is no legitimate interest in possessing cocaine, the field test did not compromise any legitimate privacy interest. *Id.*; *see also Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (officers' practice of walking a narcotics-detection dog around the exterior of each car at a drug interdiction checkpoint does not transform the seizure into a search).

Defendant tries to distinguish these cases on the ground that he has a far greater privacy interest inside his home, particularly inside the bedroom, than one has in a public space or even a car. He relies on the Court's decision in *Kyllo*, which held that the use of a thermal-imaging device to detect relative amounts of heat within a private home was a Fourth Amendment search and must be supported by probable cause and a warrant. In *Kyllo*, the Court held that where the government uses "a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.* at 40.

*Kyllo* does not support defendant's position. The *Kyllo* Court did reaffirm the important privacy interest in one's home. *See id.* at 37 ("In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes."). However, as the Court subsequently explained in *Caballes*, it was essential to *Kyllo*'s holding that the imaging device was capable of detecting not only illegal activity inside the home, but also lawful activity, including such intimate details as "at what hour each night the lady of the house takes her daily sauna and bath." *Caballes*, 125 S. Ct. at 838 (quoting *Kyllo*, 533 U.S. at 38). As the Court emphasized, an expectation of privacy regarding lawful activity is "categorically distinguishable" from one's "hopes or expectations concerning the nondetection of contraband in the trunk of his car." *Id.* Based on this reasoning, we hold that the dog sniff inside Brock's residence was not a Fourth Amendment search because it detected only the presence of contraband and did not provide any information about lawful activity over which Brock had a legitimate expectation of privacy.[1]

This conclusion is consistent with previous decisions of this Court, as well as those of the majority of our sister circuits, which have held that canine sniffs used only to detect the presence of contraband are not Fourth Amendment searches. *See United States v. Vasquez*, 909 F.2d 235, 238 (7th Cir. 1990) (collecting cases) (canine sniff of a private

---

[1] Defendant's contention that the dog could have been wrong in alerting to his bedroom, even if supported, would not affect whether the sniff itself was a search. A false alert would not reveal any private information about what was behind Brock's door, although the dog's error rate might affect whether a warrant issued in reliance on the dog sniff was supported by probable cause. In any event, Brock does not challenge Yoba's qualifications, nor does he argue that the totality of the evidence, including the dog's alert to his bedroom, was insufficient to support the search warrant.

garage from a public alley was not a warrantless search). *Accord United States v. Reed*, 141 F.3d 644, 650 (6th Cir. 1998) (where canine team was lawfully present inside a home, the canine sniff itself was not a Fourth Amendment search); *United States v. Reyes*, 349 F.3d 219, 224 (5th Cir. 2003) (dog sniff of passengers exiting bus from distance of four to five feet was not a Fourth Amendment search); *United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997) (defendant's reasonable expectation of privacy in his hotel room did not extend to hallway outside his room, and no warrant was needed to bring trained dog to conduct a narcotics sniff in hallway); *United States v. Lingenfelter*, 997 F.2d 632, 638 (9th Cir. 1993) (canine sniff of a commercial warehouse was not a search because defendant "could have no *legitimate* expectation that a narcotics canine would not detect the odor of marijuana"); *United States v. Colyer*, 878 F.2d 469, 477 (D.C. Cir. 1989) (dog sniff of a sleeper car from train's public corridor was not a search because it was not overly intrusive and "did not expose noncontraband items that otherwise would remain hidden from view"). *But see United States v. Thomas*, 757 F.2d 1359, 1366-67 (2d Cir. 1985) (canine sniff of doorway outside defendant's apartment was a search because it impermissibly intruded on defendant's legitimate expectation that the contents of his closed apartment would not be sensed from outside his door).

Whatever subjective expectation Brock might have had that his possession of narcotics would remain private, that expectation is not one "that society is prepared to consider reasonable." *Jacobsen*, 466 U.S. at 113. The Second Circuit's holding to the contrary in *Thomas*, on which defendant relies, has been rightly criticized. *See Lingenfelter*, 997 F.2d at 638 (*Thomas*'s implication "that a person has a reasonable expectation that even contraband items hidden in his dwelling place will not be revealed" is inconsistent with Supreme Court precedent); *Colyer*, 878 F.2d at 475 (ques-

tioning correctness of *Thomas*'s assertion that possessor of contraband "had a legitimate expectation that the contents of his closed apartment would remain private").

Critical to our holding that the dog sniff in this case was not a Fourth Amendment search is the fact that police were lawfully present inside the common areas of the residence with the consent of Brock's roommate. While Brock contends that he had a legitimate expectation that the contents of his locked bedroom would remain private, he does not contest in any meaningful way Godsey's authority to allow police inside the common areas of their shared home.[2] It is well settled that a third party with common authority over a home may consent to a search, obviating the need for a search warrant. *United States v. Matlock*, 415 U.S. 164, 171 (1974); *United States v. Aghedo*, 159 F.3d 308, 310 (7th Cir. 1997). Third-party consents to search shared property are based on a "reduced expectation of privacy in the premises or things shared with another." *United States v. Ladell*, 127 F.3d 622, 624 (7th Cir. 1997). When someone shares an apartment or a home with another individual, he "ordinarily assumes the risk that a co-tenant might consent to a search, at least to all common areas and those areas to which the other has access." *Id.* Once Godsey authorized the police to explore the common areas of 3381, the entry of a narcotics-sniffing dog into that space did not infringe on any legitimate privacy interest. Everything behind Brock's locked bedroom door remained undetected except the narcotics, which Brock had no right to possess in the first

---

[2] At oral argument, Brock's attorney disputed whether Godsey had consented to the search of 3381. In denying Brock's motion to suppress, the district court found that he had, and defendant has pointed to nothing in the record to support a finding to the contrary. In fact, the record provides ample support for the conclusion that Godsey voluntarily cooperated with police, informing them of the contents of 3381, and giving them a key to the house.

place. The dog sniff from the common area of defendant's residence, where police were present by consent, did not violate defendant's Fourth Amendment rights, and the district court did not err in denying Brock's motion to suppress.

## B.  Trial Rulings

Defendant claims that the district court committed several errors in conducting the trial. He argues that the court improperly limited his cross-examination of a government witness and abused its discretion in refusing to give a missing witness instruction. Brock contends that these errors deprived him of a fair trial and warrant reversal of his conviction.

### 1.  Cross-Examination

Defendant argues that the district court abused its discretion in limiting his cross-examination of Joel Dyer, one of the government witnesses who testified that he sold large quantities of methamphetamine to Brock and later purchased the drug from him. Prior to Brock's trial, Dyer had been charged in an unrelated case in state court. Those state charges were later dropped, and federal authorities brought charges against Dyer arising out of the same conduct. Dyer was federal custody at the time of his testimony in Brock's trial. During her cross-examination of Dyer, defense counsel attempted to discredit his testimony by showing that Dyer cooperated with the government and testified against defendant for the purpose of avoiding habitual offender status on his state charges.

Defense counsel questioned Dyer about his prior felony convictions, and the government objected. The court held a side bar during which the parties spent several minutes debating the factual underpinnings of defendant's bias

theory and the most appropriate way for defense counsel to question Dyer. The district court proposed a specific question, and the following exchange took place:

> The Court: You can ask him if he was ever promised anything in the state court in exchange for his cooperation.

> Defense Counsel: Okay.

> Prosecutor: And I think it is clear that he never cooperated or provided any cooperation until January 30, 2003.

> The Court: You can ask him, because if he wasn't, he wasn't, and if he was, he was, and you will be satisfied.

> Defense Counsel: Right.

> * * *

> Defense Counsel: To be clear, I can ask him if he was promised anything in state court, as far as dismissal or anything?

> Prosecutor: In exchange for cooperation.

> The Court: Right, you can ask that.

(Tr. at 252-53.)

Defense counsel then proceeded to ask Dyer several questions about whether he was promised or received any benefit in exchange for his testimony against Brock. Dyer replied that he did not, and testified in response to further questions that he was not approached about cooperating in Brock's case until January 2003, after his state charges were dismissed and federal charges were brought against him.

Brock now argues that the district court deprived him of his Sixth Amendment right to confront adverse witnesses by limiting his opportunity to question Dyer about his potential bias to a single question. The government contends

that defendant waived or at least forfeited his opportunity to make this argument because his trial counsel indicated that she was "satisfied" with the district court's proposed question and did not formally object.

Defense counsel's assent to the district court's instruction did not constitute waiver or forfeiture. During the lengthy side bar, counsel thoroughly explained the basis for her questioning Dyer about his criminal record. She was not obligated to object formally after the district court instructed her to proceed with a specific question in order to preserve the issue for our review. We conclude, however, that defendant's argument fails on the merits.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. The right to cross-examination is, of course, not unlimited. Trial courts have wide latitude "to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. McGee*, 408 F.3d 966, 975 (7th Cir. 2005) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The trial court violates the Sixth Amendment only where it has so abused its discretion as to prevent the jury from making a discriminating appraisal of the witness's testimony. *United States. v. Valles*, 41 F.3d 355, 359 (7th Cir. 1994).

Far from defendant's contention that the district court limited the cross-examination to a single question, the record reflects that the court allowed defense counsel to question Dyer repeatedly about his motivation for testifying against Brock, over the government's objection. Although Dyer denied any motivation other than a desire to tell the truth, the district court allowed defense counsel ample opportunity to present the bias theory to the jury without

permitting an open-ended inquiry into the witness's unrelated criminal history. The district court did not abuse its discretion in placing this limitation on defendant's cross-examination.

### 2. Missing Witness Instruction

Defendant also contends that the district court abused its discretion in declining to give a "missing witness instruction" with respect to Godsey. Defendant asked the district court to instruct the jury that it could infer from the government's failure to call Godsey that his testimony would have been unfavorable to the government.

"To establish entitlement to a missing witness instruction, a defendant must prove two things: first, that the absent witness was peculiarly within the government's power to produce; and second, that the testimony would have elucidated issues in the case and would not merely have been cumulative." *United States v. Gant*, 396 F.3d 906, 910 (7th Cir. 2005) (quoting *Valles*, 41 F.3d at 360). Although the missing witness instruction is generally disfavored, the district court has broad discretion in determining whether to give it. *Id.*

Brock did not prove that Godsey was within the government's power to produce, and in fact agreed with the government's representation that Godsey could not be located despite efforts to arrest him on unrelated charges. Accordingly, the district court did not abuse its discretion in declining to give the instruction.

### C. Sentence

The district court sentenced Brock to 360 months on the drug counts and a concurrent 120 months on the felon-in-possession counts. The court based its guidelines cal-

culation on the 8.42 kilograms of methamphetamine and one kilogram of cocaine seized from the 3375 and 3381 residences, as well as an additional 7.22 kilograms of methamphetamine based on the testimony of Dyer and Lewis. This quantity far exceeds the 1.5 kilograms expressly charged in the indictment, and the jury did not find Brock guilty of having possessed any specific amount above this threshold. The court also enhanced the sentence because defendant possessed a firearm during the course of the offense. Based on Brock's criminal history category II, the guidelines yielded a range of 324 to 405 months. The district court imposed a sentence in the middle of the range "due to the large amount of drugs and weapons possessed and his prior criminal convictions for drug dealing."

Defendant does not contend that the district court miscalculated his guidelines range, but argues correctly that, under *United States v. Booker*, 125 S. Ct. 738 (2005), the sentence violated the Sixth Amendment because it exceeded the maximum sentence authorized by the jury verdict. Because he did not raise this Sixth Amendment argument before the district court, we ask whether the violation constitutes plain error. *Paladino*, 401 F.3d at 481. To determine whether the prejudice prong of the plain error test has been satisfied, we order a "limited remand to permit the sentencing judge to determine whether he would (if required to resentence) reimpose his original sentence." *Id.* at 484.

### III.  Conclusion

For the foregoing reasons, Brock's conviction is AFFIRMED. We retain jurisdiction and REMAND to the district court pursuant to the procedure set forth in *Paladino*.

A true Copy:

       Teste:

                         _____
                         *Clerk of the United States Court of Appeals for the Seventh Circuit*