**UNITED STATES of America,
Plaintiff,**

**v.**

**Jason Alexander BROADWAY,
Defendant.**

**Criminal Case No. 07–cr–00517–LTB.**

United States District Court,
D. Colorado.

Oct. 2, 2008.

James R. Boma, U.S. Attorney's Office, Denver, CO, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

This drug trafficking and weapons case is before me on Defendant, Jason Alexander Broadway's, Motions to Suppress Evidence and supplemental briefing [**Docket ## 27, 28, 29, 46, 60**], and the Government's responses [**Docket ## 33, 34, 35, 48, 61, 62, 75**]. A two-day evidentiary hearing on these motions was held on August 28 and September 11, 2008. After consideration of the motions, the papers, and the case file, as well as the arguments made and evidence presented at the hearing, I find and conclude as follows.

## I. BACKGROUND FACTS

On October 8, 2007, Detective Gassman of the Denver Police Department was observing Defendant based upon information provided from a confidential source indicating a person fitting Defendant's description was selling narcotics. Detective Gassman—following Defendant's vehicle in plain clothes—observed Defendant engaging in what appeared to be a drug sale. Detective Gassman and other police officers followed Defendant's vehicle and observed Defendant driving erratically and making a turn without utilizing his turn signal. Two uniformed officers initiated a traffic stop. A search of the vehicle yielded a marijuana cigarette.

Defendant initially gave his name as "Jahon Bishop" and provided a false California driver's license to that effect. Defendant eventually gave his real name, and it was determined he had an active warrant for a felony parole violation out of California. Defendant was placed under arrest and taken to Denver Police headquarters. While in the back of the police vehicle and while at police headquarters, Defendant acted in a manner that suggest-

ed he was attempting to conceal narcotics in his buttocks. Detective Gassman obtained authorization to execute a strip search of Defendant. While executing the strip search, Detective Gassman observed a piece of plastic protruding from Defendant's anus. Another officer, Detective Bauer, then sought and received a warrant for a body cavity search, but it was never executed. No drugs were ever found on Defendant's person.

The following day, October 9, 2007, police officers—including Detectives Gassman and Bauer—went to Defendant's apartment building at 1355 York Street—also known as York Street Garden Apartments—in Denver. Detective Gassman noted that the mailboxes listed "J. Bishop"—the false name given by Defendant during his arrest—as living in unit four. The officers spoke with Mr. Gonzales, the resident of unit one—the doorway to which was located in the unsecured entryway to the building—and an employee of York Street Garden Apartments. Mr. Gonzales confirmed Defendant resided in unit four and gave the officers permission to enter the secure common area of the building. Once inside the building, Detective Gassman confirmed with another resident that Defendant lived in unit four. Detective Romero—a trained canine unit detective—was then summoned and arrived with "Wyatt," a drug-sniffing dog. Wyatt alerted in the hallway outside Defendant's apartment and also alerted on the walkway outside Defendant's partially open basement-level window.

Detective Gassman then sought and received a search warrant for Defendant's apartment, relying in part on the results of the dog sniff. When the officers entered the apartment, they smelled a strong odor of marijuana. The ensuing search turned up over one pound of cocaine and crack cocaine, a .38 revolver, a small amount of marijuana, baggies, and scales.

When germane, additional factual determinations will be set forth in this order.

## II. PENDING MOTIONS

There are six motions pending in this case, four of which are ruled upon in this Order. I consider each in chronological order of the allegedly improper acts.

### A. Motion to Suppress Evidence Obtained through the Illegal Stop and Search of Mr. Broadway [Docket # 28]

Defendant challenges the initial stop and search of his car on October 8, 2007. It is well-established that an automobile stop is subject to the Fourth Amendment imperative that guarantees the right to be free from unreasonable searches and seizures. See Whren v. United States, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at 810, 116 S.Ct. 1769. If a traffic violation is observed, the traffic violation forms a reasonable basis for the stop, even when the ultimate purpose of stopping the vehicle is to search for contraband. See id. at 812–13, 116 S.Ct. 1769.

At the August 28, 2008, hearing, Detective Gassman testified he was following Defendant on October 8, 2007, and observed Defendant pick up a white male near the intersection of Jewell Avenue and Clermont Street. Detective Gassman then observed Defendant and the white male drive around the block before the white male exited the vehicle. Believing this activity to be a drug transaction, Detective Gassman—as well as six or seven other officers in separate cars—began to follow Defendant. Detective Gassman observed Defendant engage in numerous traffic violations—including speeding, failure to stop

at a stop sign, and failure to use a turn signal—but did not include all of these observations in his report. Detective Gassman testified he lost sight of Defendant for approximately ten to fifteen minutes, during which time the traffic stop was initiated.

Detective Bauer testified he too was following Defendant. Although he also lost sight of Defendant at one point, Detective Bauer testified he located Defendant's vehicle going eastbound on 21st Avenue and then observed Defendant turning southbound onto High Street without signaling. Detective Bauer notified uniformed officers Luke and Miner, who initiated the stop.

■ Defendant argues Detective Gassman could not have observed Defendant making an illegal turn because he was not in eye sight of Defendant's vehicle. Defendant also notes the conflicting report of Officer Luke, who stated Defendant was stopped because Defendant had a tree air freshener hanging from his rear view mirror that obstructed Defendant's view. Defendant's argument on these points is irrelevant to the question of reasonableness, however, because the testimony presented showed it was Detective Bauer who observed Defendant make an illegal turn. As Detective Bauer's testimony in this regard was both credible and uncontradicted, I accept it as fact and find and conclude the stop of Defendant's vehicle was reasonable. Accordingly, Defendant's Motion to Suppress Evidence Obtained through the Illegal Stop and Search of Mr. Broadway [**Docket # 28**] is denied.

B. *Motion to Suppress Evidence, Observations, and Statements Obtained from the Illegal Strip Search of Mr. Broadway [**Docket # 29**]*

When Defendant's vehicle was stopped, Defendant initially gave police a fake driver's license. After Defendant's true identity was discovered following additional questioning, police determined he had an outstanding warrant and took him into custody. Once at Denver Police headquarters, Detective Gassman obtained written authorization for a strip search. Defendant alleges Detective Gassman also searched his anal cavity. No physical evidence was obtained during the strip search.

Defendant does not raise a Fifth Amendment argument in this motion, and I do not consider it here. Instead, Defendant argues any statements he made during the search should be suppressed under the Fourth Amendment because the strip search was executed in violation of Colorado's strip search statute, COLO. REV. STAT. § 16–3–405. Whether the strip search violated Colorado state law, however, is not the relevant inquiry. *See Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Gaines v. Stenseng,* 292 F.3d 1222, 1225 (10th Cir.2002). "The only issue is whether the strip search in the case at bar violated [Defendant's] constitutional right against unreasonable searches and seizures, as guaranteed by the Fourth and Fourteenth Amendments." *See Allen v. Bd. of Comm'rs of County of Wyandotte,* 773 F.Supp. 1442, 1447 n. 6 (D.Kan.1991). Although Defendant claims he was subject to a body cavity search—a claim which is not borne out by a review of the videotape of his search—this does not change the general inquiry of reasonableness under the circumstances. *See Bell v. Wolfish,* 441 U.S. 520, 558–59, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (holding body cavity searches do not violate the Fourth Amendment so long as they are reasonable under the circumstances); *Massey v. Wilson,* 484 F.Supp. 1332, 1333 (D.Colo.1980).

■ Whether a strip search or body cavity search is "reasonable" under the Fourth Amendment "requires a balancing

of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell, supra,* 441 U.S. at 559, 99 S.Ct. 1861.

■ The alleged body cavity search in this case—if it occurred at all—could only have been fleeting and superficial. A review of the videotape shows a combative Defendant. The video shows Detective Gassman attempted a visual inspection of Defendant's buttocks area, but does not at any time reveal any actual touching, penetration, attempted touching, or attempted penetration of Defendant's anus or anal cavity. Accordingly, the scope of the search and the manner in which the search was conducted was reasonable.

■ The search was also justified. Under federal constitutional law, it is "clearly established that a strip search is justified if the suspect is to be placed in the general jail population and has been charged with a drug offense." *Warner v. Grand County,* 57 F.3d 962, 964 (10th Cir.1995) (citations omitted); *see also Archuleta v. Wagner,* 523 F.3d 1278, 1284 (10th Cir.2008). As Defendant was arrested on an outstanding warrant for a felony parole violation, it cannot seriously be doubted that he would be placed in the general jail population. It is also undisputed that Defendant was believed to be engaged in drug trafficking. Moreover, both Detective Gassman and Detective Bauer observed Defendant engaging in activity that appeared to indicate he was secreting drugs in his buttocks or anal cavity. The videotape taken at Denver Police headquarters shows a similar pattern of activity, with Defendant frequently attempting to reach into his buttocks area and repeatedly turning his buttocks away from the officers in an apparent attempt to obfuscate their search.

Under these circumstances, Detective Gassman's suspicion that Defendant had drugs in his buttocks or anal cavity was reasonable and the ensuing search was justified. *See Romo v. Champion,* 46 F.3d 1013, 1019–20 (10th Cir.1995).

■ The final reasonableness inquiry focuses on the place where the search is conducted. A review of the videotape of Defendant's search shows the search occurred in a small room at Denver Police headquarters, but that the door to the room was open during the search. The Tenth Circuit has held that a strip search must be conducted in private unless there exists a rational security basis for conducting the search in a public place. *See Farmer v. Perrill,* 288 F.3d 1254, 1260 (10th Cir.2002); *Hill v. Bogans,* 735 F.2d 391, 394 (10th Cir.1984). A review of the videotape shows that Detective Gassman initiated the search with the door closed, but Defendant became belligerent and aggressive and the door subsequently remained open after at least four other officers entered to assist. Defendant's combative resistance, particularly when combined with the extremely small area of the interview room, provides an ample security-related justification for why the door to the room remained open. Accordingly, I find and conclude Defendant was properly searched incident to his lawful arrest, and any statements made during or as the result of the strip search need not be suppressed under the Fourth Amendment. *See United States v. McKissick,* 204 F.3d 1282, 1296–97 (10th Cir.2000).

### C. Motion to Suppress Statements *[Docket # 46]*

■ Following the strip search, Defendant was taken to Denver Health Medical Center ("DHMC") for purposes of executing the body cavity search warrant. While

under observation at DHMC, Defendant made several statements to Detective Starnes. The next day—after being given a *Miranda* advisement and voluntarily waiving his *Miranda* rights—Defendant was interviewed by ATF Special Agent Tabullo. Approximately twenty-nine minutes into the tape-recorded interview with Agent Tabullo, Defendant stated: "This conversation is over." Nonetheless, Tabullo continued to question Defendant for an additional half hour. As the Government now concedes [**Docket ## 48, 75**] Defendant invoked his *Miranda* rights by his statement, "This conversation is over," any statements Defendant made subsequently must be suppressed.

Defendant also seeks by this motion to suppress statements made during the strip search and his conversation with Detective Starnes. It is not disputed that Defendant was not given his *Miranda* advisement until October 9, 2007—the day after these statements were made.

■■■ Once a suspect is in custody—as there is no doubt Defendant was upon being handcuffed and placed in the back of a police vehicle—police may not interrogate the suspect without first advising him of his Fifth Amendment rights as laid out in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and obtaining a knowing, intelligent, and voluntary waiver of those rights. *See Oregon v. Elstad,* 470 U.S. 298, 304–06, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Any pre-warning statements made under custodial interrogation must be suppressed. *See id.; Miranda,* 384 U.S. at 476, 86 S.Ct. 1602. Any statement given freely and voluntarily without compelling influence, however, is admissible. *Rhode Island v. Innis,* 446 U.S. 291, 299–300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Miranda,* 384 U.S. at 478, 86 S.Ct. 1602.

" 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a meas-

ure of compulsion above and beyond that inherent in custody itself.... That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Innis, supra,* 446 U.S. at 299–301, 100 S.Ct. 1682.

■■■ A review of the evidence introduced at the hearing shows two incidents of police attempting to elicit a response from Defendant prior to advising him of his *Miranda* rights. The first incident occurred during the initial interview/strip search at Denver Police headquarters. Detective Gassman testified—and the videotape shows—he told Defendant that Defendant had been "set up" by the "white guy" he picked up immediately prior to his arrest. Detective Gassman testified he made this statement as part of an "investigation technique" intended to elicit a response. The use of an "investigation technique" that the police should know is—and, in this case, actually intended to be—reasonably likely to evoke an incriminating response from a suspect amounts to interrogation. *See Innis, supra,* 446 U.S. at 301, 100 S.Ct. 1682. Accordingly—while it is not clear that Defendant made any statements as a result of Detective Gassman's "investigation technique"—any response must be suppressed. *See id.* at 301–02, 100 S.Ct. 1682.

The second incident occurred while Defendant was at DHMC, but before Agent Tabullo gave Defendant his *Miranda* advisement. After the search warrant for Defendant's apartment was executed, Detective Gassman sent photos of the recov-

ered cocaine to Detective Starnes by text message. Detective Starnes, who was guarding Defendant at DHMC, showed the photographs to Defendant. Defendant is then alleged to have made several incriminating statements to Detective Starnes.

■■■ Detective Starnes conceded that—by showing Defendant photographs of the drugs—he expected Defendant to "strike up a conversation" with him. Such a "conversation" should reasonably have been expected to include incriminating statements. Detective Starnes testified that it is standard departmental procedure to inform suspects about the results of a search executed by warrant. But that is properly the function of the written inventory, and that formal inventory should have been delivered to Defendant at a later time and place—here, the next day, after Agent Tabullo's *Miranda* advisement. The line is a fine one, but I conclude Detective Starnes impermissibly crossed the constitutional threshold. Accordingly—while it is again not entirely clear what statements Defendant made to Detective Starnes after seeing the drug photographs—any such statements must be suppressed.

### D. Motion to Suppress Evidence Obtained through the Execution of the Legally Insufficient Search Warrant [Docket # 27]

While Defendant was in custody on October 9, 2007, Detectives Gassman and Barnes went to 1355 York Street and determined that Defendant resided in unit four. Detective Romero was called to the scene with his drug-sniffing dog, Wyatt. Wyatt alerted in the hallway outside of Defendant's unit, as well as in the walkway on the exterior of the building outside Defendant's partially open window. Detective Gassman, relying in part on the results of the dog sniff test, requested and was issued a search warrant for Defendant's apartment.

Defendant argues the search warrant was legally insufficient because it relied on the result of the dog sniff. Defendant argues the dog sniff constituted an illegal warrantless search of his home because (1) a dog sniff outside a person's home is a search of the home under the Fourth Amendment; and (2) even if a dog sniff is not a search *per se*, the search was improper in this instance because Detective Romero did not have the authority to conduct the sniff test in the hallway or walkway outside of Defendant's apartment.

*1. Whether the dog sniff in the hallway of Defendant's building constituted a "search" under the Fourth Amendment*

■■■ "A search for purposes of the Fourth Amendment occurs when government officials violate an individual's legitimate expectation of privacy." *United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir.1998). The "burden of demonstrating a subjective expectation of privacy that society is prepared to recognize as reasonable" is on Defendant. *See id.*

In making the "legitimate expectation of privacy" inquiry, the Court first asks whether the individual asserting the expectation has shown that he seeks to preserve something as private and then asks whether the expectation is reasonable. *See Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). It does not appear to be disputed—in light of Defendant's efforts to conceal his drugs in his locked apartment in well-wrapped packages—that Defendant meets the first inquiry.

■■■ In making the reasonableness inquiry, the Court asks whether the expectation—when viewed objectively—is one society is willing to recognize as justified under the circumstances. *See id.* "It is a basic principle of Fourth Amendment law that searches and seizures inside a home

without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). It is not established in this Circuit, however, whether a warrantless dog sniff outside a home amounts to an improper search of the home's interior. I hold it does not.

### a. Prior "dog sniff" case law

The Supreme Court—in the context of a canine drug sniff performed on luggage at an airport—stated:

> A "canine sniff" by a well-trained narcotics detection dog ... does not expose noncontraband items that otherwise would remain hidden from public view.... Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods. In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here—exposure of respondent's luggage, which was located in a public place, to a trained canine—did not constitute a "search" within the meaning of the Fourth Amendment.

*United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

The Supreme Court recently revisited the issue in *Illinois v. Caballes,* 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). In *Caballes,* the Court first summarized prior jurisprudence holding a canine sniff by a narcotics-detection dog to be "*sui generis* " because "it discloses only the presence or absence of narcotics, a contraband item." *See id.* at 409, 125 S.Ct. 834 (quoting *Place, supra,* 462 U.S. at 707, 103 S.Ct. 2637). The Court then held:

> the use of a well-trained narcotics-detection dog—one that "does not expose noncontraband items that otherwise would remain hidden from public view"—during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.... The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

*See id.* at 409, 125 S.Ct. 834 (quoting *Place,* 462 U.S. at 707, 103 S.Ct. 2637).

Defendant—while not discounting the holdings of these prior cases—argues I should adopt the reasoning of the Second Circuit in *United States v. Thomas,* 757 F.2d 1359 (2d Cir.1985). In *Thomas,* the defendant's home was searched pursuant to a warrant. *Id.* at 1365–66. The issuing magistrate found probable cause based on

an affidavit furnished by a DEA agent that noted—in part—a positive narcotics dog sniff outside the defendant's apartment that indicated the presence of narcotics inside. *Id.* at 1366. The affidavit also stated the defendant had acted in a suspicious manner the previous day and was identified by a reliable informant as a narcotics dealer. *Id.* The Second Circuit—while noting the Supreme Court's ruling in *Place*—held that the legitimate expectation of privacy in one's home is greater than the legitimate expectation in one's luggage, and therefore found the warrantless dog sniff to violate the Fourth Amendment:

> With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses. Consequently, the officers' use of a dog is not a mere improvement of their sense of smell ... but is a significant enhancement accomplished by a different, and far superior, sensory instrument. Here the defendant had a legitimate expectation that the contents of his closed apartment would remain private, that they could not be "sensed" from outside his door. Use of the trained dog impermissibly intruded on that legitimate expectation.... Because of defendant Wheelings' heightened expectation of privacy inside his dwelling, the canine sniff at his door constituted a search. As the agent had no warrant, the search violated the Fourth Amendment.

*Thomas,* 757 F.2d at 1366–67.

As noted by the United States District Court, District of Kansas, however, *Thomas* seems to stand alone in its pronouncement that a canine sniff may constitute an unreasonable search. *See United States v. Meindl,* 83 F.Supp.2d 1207, 1217 (D.Kan. 1999). Numerous appellate courts have noted *Thomas* conflicts with the Supreme Court's determination that no legitimate expectation of privacy is impinged by gov-

ernmental conduct, such as a dog sniff, that can "reveal nothing about noncontraband items." *See, e.g., United States v. Brock,* 417 F.3d 692, 696–97 (7th Cir.2005); *United States v. Reed,* 141 F.3d 644, 650 (6th Cir.1998); *United States v. Lingenfelter,* 997 F.2d 632, 638 (9th Cir.1993); *United States v. Colyer,* 878 F.2d 469, 475 (D.C.Cir.1989); *see also United States v. Roby,* 122 F.3d 1120, 1124–25 (8th Cir. 1997) (rejecting *Thomas* in the context of a hotel room). The Tenth Circuit—while it did not address the issue on all fours—has also noted this criticism. *See United States v. Cusumano,* 67 F.3d 1497, 1509 n. 27 (10th Cir.1995).

Although the Tenth Circuit has never ruled on the precise issue whether a canine sniff test outside a person's home constitutes a "search" of that home sufficient to raise the Fourth Amendment's protections, some guidance can be found from a review of analogous cases. For example, the Tenth Circuit previously ruled that a canine sniff in the hallway of a storage locker building did not constitute a search because—even though the area inside the locker was private—the hallway outside the locker "was at least semi-public in nature." *See United States v. Venema,* 563 F.2d 1003, 1005 (10th Cir.1977). The court held that the detection of odors outside the locker involved "no physical trespass of the locker itself." *Id.* The Tenth Circuit ruled similarly in *United States v. Morales–Zamora,* 914 F.2d 200 (10th Cir. 1990), when it held—in the context of a dog sniff outside a motor vehicle—that "society does not recognize a reasonable privacy interest in the public airspace containing the incriminating odor." *Id.* at 205.

In a more modern case reflecting the Supreme Court's analysis in *Caballes,* the Tenth Circuit stated in *United States v. Hunnicutt,* 135 F.3d 1345 (10th Cir.1998):

"A canine sniff itself does not implicate Fourth Amendment rights because of the limited information it provides and its minimal intrusiveness." *Id.* at 1350. Similarly, as held in *Cusumano,* a dog sniff "detects only the presence of narcotics that an individual cannot lawfully possess; the dog sniff therefore cannot reveal information about conduct or activity that an individual has a right to pursue." *Cusumano, supra,* 67 F.3d at 1508. As recently as 2003, the Tenth Circuit stated flatly: "dog sniffs are not 'searches' within the meaning of the Fourth Amendment." *United States v. Ramirez,* 342 F.3d 1210, 1213 (10th Cir. 2003). Together, these Tenth Circuit cases strongly suggest a dog sniff—even when employed outside a residence—does not constitute a "search" of the interior of that residence for which a warrant is required under the Fourth Amendment.

### b. *Kyllo v. United States*

Defendant argues that the Supreme Court's decision in *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), teaches that the heightened expectation of privacy in one's home makes the warrantless search in this case improper. In *Kyllo,* the Supreme Court considered whether the use of a thermal imaging device to discover heat emanating from a home—consistent with the cultivation of marijuana—constituted a "search" under the Fourth Amendment. The Court held that the thermal imaging equipment revealed private details about the interior of the home that would have been undiscoverable without the assistance of specialized technology, and therefore constituted a search of the interior of that home for purposes of the Fourth Amendment for which a warrant was required. *See id.* at 40, 121 S.Ct. 2038. Defendant argues a drug-sniffing dog—like thermal imaging equipment—is a specialized device that reveals private details about the interior of a home. Accordingly, Defendant argues I should extend *Kyllo* to the circumstances

of this case and find the dog sniff outside his apartment to be "presumptively unreasonable without a warrant." I decline this invitation.

Defendant's reliance on *Kyllo* in the context of a dog sniff test is misplaced. Initially, I note that the Supreme Court in *Caballes* distinguished a dog sniff test from the use of thermal imaging equipment considered in *Kyllo:*

> Critical to [the *Kyllo* ] decision was the fact that the device was capable of detecting lawful activity—in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

*Caballes, supra,* 543 U.S. at 409–10, 125 S.Ct. 834 (quoting *Kyllo, supra,* 533 U.S. at 38, 121 S.Ct. 2038).

The *Kyllo* Court emphasized that requiring a warrant for the use of thermal imaging technology "assures preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Kyllo,* 533 U.S. at 34–35, 121 S.Ct. 2038. Quoting *Carroll v. United States,* 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Court further noted: "The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted." *Kyllo,* 533 U.S. at 40, 121 S.Ct. 2038. Thus, if "the Government uses a device that is not in

general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." *Id.*

It cannot seriously be argued that a dog can explore "details of the home" that would "previously have been unknowable" without physical intrusion. As early as 800 B.C., Homer told the story of Argos—a dog raised by Ulysses before setting out for Troy—who recognized Ulysses disguised as a beggar. In 1848, John Lord Campbell recounted the tale of Sir Thomas More, after being appointed Lord Chancellor in October 1529, employing a beggar-woman's little dog to discover her identity. JOHN LORD CAMPBELL, 1 THE LIVES OF THE LORD CHANCELLORS 548–49 (3d ed. 1848). In 1918, a court in Kentucky noted dogs had been employed as scent-detectors for hundreds of years. *See Fitzgerald v. Maryland,* 153 Md.App. 601, 837 A.2d 989, 1037 (2003) (citing *Blair v. Kentucky,* 181 Ky. 218, 204 S.W. 67, 68 (Ky.Ct.App.1918)). To the extent a dog can detect a scent, therefore, it does not detect anything that "would have been unknowable" without physical intrusion when the Fourth Amendment was adopted in 1791. *Cf. Cusumano, supra,* 67 F.3d at 1509 (distinguishing a thermal imaging device from "the less refined tools of days past"). Moreover, it cannot be doubted that a dog sniff—unlike a thermal imaging device—does not reveal "details of the home" because a dog sniff—unlike a thermal imaging device—does not reveal any details at all, but "informs the police instead merely of a reasonable chance of finding contraband they have yet to put their hands on." *See Caballes, supra,* 543 U.S. at 416, 125 S.Ct. 834 (Souter, J., dissenting).

 Further—unlike the thermal imaging devices in *Kyllo*—a dog sniff does not detect "information regarding the inte-rior of the home" that could not otherwise have been obtained without "physical 'intrusion into a constitutionally protected area.'" *Kyllo,* 533 U.S. at 34, 121 S.Ct. 2038 (quoting *Silverman v. United States,* 365 U.S. 505, 512, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). Simply put, a dog—unlike a thermal imaging device—does not detect anything inside a home, but merely detects the particulate odors that have escaped from a home. In that sense, the odors are no longer "private," but instead are intermingled with "the public airspace containing the incriminating odor." *See Morales–Zamora, supra,* 914 F.2d at 205. No physical intrusion is—or historically has been—required to detect suspicious odors. *See, e.g., Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (noting the smell of opium emanating from a room provides probable cause to believe opium is being smoked inside); *Taylor v. United States,* 286 U.S. 1, 6, 52 S.Ct. 466, 76 L.Ed. 951 (1932) (noting police officers—as they "approached the garage"—relied on their sense of smell to determine "the odor of whisky coming from within"); *Venema, supra,* 563 F.2d at 1005 (holding the detection of odors outside the locker involved "no physical trespass of the locker itself"). The fact that the smell at issue here was detected by a dog rather than a human does not change its fundamental non-private nature. *Cf. United States v. Bronstein,* 521 F.2d 459, 461 (2d Cir.1975) (noting the constitutional privacy interest in a smell is the same whether the smell is detected by a canine nose or a human nose). Accordingly, I hold that "as long as the canine unit is lawfully present when the sniff occurs, the 'canine sniff is not a search within the meaning of the Fourth Amendment.'" *Meindl, supra,* 83 F.Supp.2d at 1217 (quoting *Reed, supra,* 141 F.3d at 650).

### c. "Pseudo-controlled" substances and Justice Souter's dissent in *Caballes*

Defendant presented evidence showing that drug-sniffing dogs are sometimes trained to detect "pseudo-controlled" substances—that is, legal chemicals with the same smell as illegal narcotics. Justice Souter—although his concern was with general canine error, not misidentifying pseudo-controlled substances as narcotics—raised this issue in his dissent in *Caballes*, noting:

> At the heart both of *Place* and the Court's opinion today is the proposition that sniffs by a trained dog are *sui generis* because a reaction by the dog in going alert is a response to nothing but the presence of contraband. Hence, the argument goes, because the sniff can only reveal the presence of items devoid of any legal use, the sniff "does not implicate legitimate privacy interests" and is not to be treated as a search.... The infallible dog, however, is a creature of legal fiction.... In practical terms, the evidence is clear that the dog that alerts hundreds of times will be wrong dozens of times. Once the dog's fallibility is recognized, however, that ends the justification claimed in *Place* for treating the sniff as *sui generis* under the Fourth Amendment: the sniff alert does not necessarily signal hidden contraband, and opening the container or enclosed space whose emanations the dog has sensed will not necessarily reveal contraband or any other evidence of crime.

*Caballes, supra*, 543 U.S. at 411–13, 125 S.Ct. 834 (Souter, J., dissenting). The majority opinion in *Caballes*, however, rejected Justice Souter's concern in light of the facts presented.

After first summarizing prior jurisprudence holding a canine sniff by a narcotics-detection dog to be *"sui generis"* because "it discloses only the presence or absence of narcotics, a contraband item," the majority opinion in *Caballes* noted that "respondent argues that the error rates, particularly the existence of false positives, call into question the premise that drug-detection dogs alert only to contraband." *See Caballes*, 543 U.S. at 409, 125 S.Ct. 834 (quoting *Place, supra*, 462 U.S. at 707, 103 S.Ct. 2637). Upon reviewing the record, however, the Court found the evidence of error rates in Caballes's case to be lacking. *See id.* The Court went on to hold that even if a dog did erroneously alert on "noncontraband items," the alert in and of itself does not reveal any "legitimate private information." *See id.* at 409–10, 125 S.Ct. 834.

 Like the defendant in *Caballes*, Defendant here presented no evidence suggesting that Wyatt would have alerted on noncontraband items. *See Caballes*, 543 U.S. at 409, 125 S.Ct. 834. Detective Romero testified credibly that Wyatt had never been trained to smell pseudo-narcotics to the best of his knowledge. Although Defendant presented evidence showing Wyatt occasionally alerted when no drugs were found, Defendant presented no evidence showing Wyatt had ever alerted to a smell that was determined to be emanating from a non-controlled or pseudo-controlled substance. Accordingly, I find that Wyatt's trained responses were sufficiently reliable to establish probable cause as to the existence of narcotics. Even if Defendant had presented some evidence impugning Wyatt's reliability, however, the fact that a dog may alert on noncontraband items "is not, of course, to deny that a dog's reaction may provide reasonable suspicion, or probable cause, to search the container or enclosure; the Fourth Amendment does not demand certainty of success to justify a search for evidence or contraband." *See Caballes*, 543 U.S. at 413, 125 S.Ct. 834 (Souter, J., dissenting).

Justice Souter also took issue with the application of *Place* in *Caballes* because in *Caballes* "the police claim[ed] to have had no particular suspicion that Caballes was violating any drug law." *See Caballes,* 543 U.S. at 414, 125 S.Ct. 834. In contrast, "in *Place* itself, the Government officials had independent grounds to suspect that the luggage in question contained contraband before they employed the dog sniff." *See Caballes,* 543 U.S. at 415 n. 5, 125 S.Ct. 834. "Since the police [in *Caballes* ] had no indication of illegal activity beyond the speed of the car ... the sniff search should be held unreasonable under the Fourth Amendment and its fruits should be suppressed." *Id.* at 415, 125 S.Ct. 834. Justice Souter's concern in this regard does not apply here, however, because Detective Gassman had been informed by a reliable informant that Defendant was engaged in drug trafficking and Detective Gassman subsequently observed Defendant engaged in what appeared to be a drug sale.

2. *Whether Detective Romero had authority to conduct the sniff test in the hallway or walkway outside of Defendant's apartment*

As held above, as long as a canine unit is lawfully present when a drug sniff occurs, the sniff is not a search within the meaning of the Fourth Amendment. Defendant argues, however, that Detective Romero was not authorized to be in the hallway outside Defendant's apartment or in the walkway outside Defendant's window.

A review of the evidence presented at the hearing shows Detective Romero was authorized to be in both locations. Detective Gassman testified credibly at the hearing that he was let into the secure hallway outside Defendant's apartment by Mr. Gonzales—the undisputed resident of unit one in Defendant's building. The evidence showed that the door to Mr. Gonzales's unit was in an unsecured hallway and the door to Defendant's unit was in a hallway behind a locked door. Detective Gassman testified that Mr. Gonzales identified himself as the onsite groundskeeper—which Gassman interpreted to mean apartment manager—and stated he had been working for York Street Garden Apartments for many years. Mr. Gonzales unlocked the secure door and gave Detective Gassman permission to enter the secured area of the building. Once Detective Gassman was in the secure area, he tested keys previously seized from Defendant and determined one of the keys fit the secure door. None of this credible testimony was contradicted at the hearing—and most of it was confirmed by Detective Bauer's testimony—and I accept it as fact here.

■■■ Defendant argues Mr. Gonzales did not have the authority to allow Detective Gassman into the secure hallway. Initially, I note that "a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building." *United States v. Barrows,* 481 F.3d 1246, 1249 (10th Cir.2007) (citing *United States v. Hawkins,* 139 F.3d 29, 32 (1st Cir.1998)). Accordingly, any resident of the apartment building could consent to a search of the common hallway area, provided they had the actual or apparent authority to do so. *See id.*

In order to establish Mr. Gonzales possessed actual authority to consent to a search of the secure hallway, the burden is on the Government to show by a preponderance of the evidence that (1) Mr. Gonzales had unfettered access to the secure hallway or (2) other facts sufficient to give rise to a presumption that Mr. Gonzales had control over the secure hallway for most purposes. *See United States v. Cos,* 498 F.3d 1115, 1125–26 (10th Cir.2007); *United States v. Rith,* 164 F.3d 1323, 1329– 31 (10th Cir.1999); *United States v. McAlpine,* 919 F.2d 1461, 1463 (10th Cir.1990).

If actual authority is established, "the person whose property is searched is unjustified in claiming an expectation of privacy in the property because that person cannot reasonably believe that the joint user will not, under certain circumstances, allow a search in her own right." *McAlpine*, 919 F.2d at 1463.

■ The facts presented show by a preponderance of the evidence that Mr. Gonzales had unfettered access to the secure hallway. He had a key to the hallway, and was employed as a maintenance man for the building. Mr. Gonzales was also a resident of the building and can be assumed to have had free use of the building's hallways. Moreover, even if Mr. Gonzales was confined to the entryway of the building—a contention which defies belief in light of his statements that he was "hired to take care of the halls" [**Docket # 55-3**] and "if I see a stranger in the building I would follow them" [**Docket # 55-5**]—an affidavit submitted by Defendant and signed by an investigator for the Office of the Federal Public Defender, states: "Mr. Gonzales said his boss [the apparent actual property manager] has instructed him that whenever the police show up, he must let them in." [**Docket # 55-4**]. Accordingly, I find and conclude that Mr. Gonzales had actual authority to allow Detective Gassman into the secure hallway.

■ Even if Mr. Gonzales did not have actual authority to allow police into the secure hallway, the evidence presented shows he had apparent authority to consent to such a search. A "party has apparent authority to consent to a search if a police officer reasonably, but erroneously, believes that the third party has actual authority to consent." *Cos, supra*, 498 F.3d at 1128. Mr. Gonzales's apartment location—within the unsecured entryway—indicated his position as the building "super." Further, in light of Mr. Gonzales's

statements that he was a resident and employee of York Street Garden Apartments, and in light of the fact that he had keys to the secured doorway, "a person of reasonable caution" would believe Mr. Gonzales had authority to authorize entry into the secure hallway. *See id.* at 1128, 1130.

■ Having established that Detective Gassman's—and therefore Detective Romero's—entry into the secure hallway was pursuant to the valid consent of Mr. Gonzales, I now turn to the dog sniff outside Defendant's window. At the hearing, Defendant made much ado about whether the walkway outside Defendant's window allowed access to the back alley, or whether the walkway was partially enclosed by a fence. Because Mr. Gonzales consented to the search, however, it is not necessary to pursue this line of inquiry. Mr. Gonzales was a "grounds keeper" and resident of 1355 York Street, and it cannot be disputed that he had unfettered access to the walkway—even if his authority over the secured hallway was questionable.

Accordingly, I find and conclude Detective Romero was properly in the secure hallway and the walkway outside Defendant's apartment when he initiated the dog sniff, and Defendant's motion to suppress the results of the dog sniff are denied. As Defendant's Motion to Suppress Evidence Obtained through the Execution of the Legally Insufficient Search Warrant [**Docket # 27**] is predicated upon suppression of the results of the dog sniff test, Defendant's motion is likewise denied.

### III. MOTION FOR HEARING PURSUANT TO *FRANKS v. DELAWARE* [Docket # 55]

On June 9, 2008, Defendant filed a motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Although this motion

was neither granted nor denied, a two-day evidentiary hearing on Defendant's other motions was held on August 28 and September 11, 2008. From the broad language of the *Franks* motion, it is not clear whether Defendant's evidence presented at the August 28 and September 11, 2008, hearing was sufficient to address the issues raised. Defendant shall have up through and including October 31, 2008, to inform the Court whether his motion should be denied as moot, or whether he is requesting an additional hearing.

## IV. CONCLUSION

Accordingly, after consideration of the motions, the papers, and the case file, as well as the arguments made and evidence presented at the two-day evidentiary hearing held on August 28 and September 11, 2008, IT IS HEREBY ORDERED as follows:

1. Defendant's Motion to Suppress Evidence Obtained through the Illegal Stop and Search of Mr. Broadway [**Docket # 28**] is DENIED;

2. Defendant's Motion to Suppress Evidence, Observations, and Statements Obtained from the Illegal Strip Search of Mr. Broadway [**Docket # 29**] is DENIED;

3. Defendant's Motion to Suppress Statements [**Docket # 46**] is GRANTED IN PART and DENIED IN PART as follows:

a. Any statements made by Defendant following his statement to Special Agent Tabullo that "this conversation is over" must be suppressed;

b. For statements made during the initial interview/strip search at Denver Police headquarters, any statements made by Defendant after Detective Gassman told Defendant that Defendant had been "set up" by the "white guy" he picked up immediately prior to his arrest must be suppressed;

c. For statements made while Defendant was under Detective Starnes's supervision at DHMC, any statements made by Defendant after Detective Starnes showed Defendant photographs of the cocaine recovered from Defendant's apartment must be suppressed;

d. Defendant's motion is otherwise DENIED;

4. Defendant's Motion to Suppress Evidence Obtained through the Execution of the Legally Insufficient Search Warrant [**Docket # 27**] is DENIED;

5. Defendant's Motion for Hearing Pursuant to *Franks v. Delaware* [**Docket # 55**] is HELD IN ABEYANCE pending additional briefing. Defendant shall have up through and including October 31, 2008, to inform the Court whether his motion should be denied as moot, or whether he is requesting an additional hearing. The Government shall have up through and including November 14, 2008, to respond.