JUSTICE SAMOUR, dissenting.
¶84 Today the majority concludes that a dog sniff of the public air outside a car, *420 though not a search under the Federal Constitution, is a search under the Colorado Constitution because Amendment 64 legalized the possession of marijuana in limited circumstances. However, in doing so, the majority skirts a critical question in the analysis: Does a driver have a reasonable expectation of privacy in the odors that escape from his car and become part of the public airspace? Instead, the majority: (1) draws an unwarranted inference from Illinois v. Caballes , 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ; and (2) analogizes a dog sniff of the public air outside a lawfully stopped car to the use of a thermal-imaging device aimed at a private home to detect relative amounts of heat inside. And, to boot, the majority purports to nestle its ruling in the Colorado Constitution when it is clearly anchored to Fourth Amendment jurisprudence. Accordingly, while I wholeheartedly join the Chief Justice's well-reasoned dissent, I write separately to express additional bases of disagreement with the majority's decision.
I. Overview
¶85 The majority's flawed reasoning goes something like this:
(1) the Fourth Amendment protects people from unreasonable searches and seizures, and warrantless searches are presumed unreasonable and, therefore, unconstitutional;
(2) the U.S. Supreme Court held in Katz v. United States , 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), that a search under the Fourth Amendment occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable;
(3) Amendment 64 created a reasonable expectation of privacy in the possession of an ounce or less of marijuana by adults twenty-one and older in Colorado;
(4) McKnight was older than twenty-one when his car was lawfully stopped;
(5) therefore, officers violated McKnight's rights under the Colorado Constitution (article II, section 7 ) when they had Kilo-a dog trained to detect the odor of drugs (including marijuana)-sniff the public air around his car without a warrant.
¶86 Even assuming Amendment 64 created the reasonable expectation of privacy the majority says it did, the majority's analysis is incomplete. To be sure, under the U.S. Supreme Court case law on which the majority opinion rests, McKnight had a reasonable expectation of privacy in any noncontraband items in his car. (Although I agree with the Chief Justice's views, I assume for purposes of this dissent that possession of up to an ounce of marijuana by someone who is at least twenty-one qualifies as possession of noncontraband in Colorado after the passage of Amendment 64). Even so, that leaves a question still to be answered: Did McKnight also have a reasonable expectation of privacy (under the Colorado Constitution or any other authority) in odors that emanated from noncontraband items in his car and escaped into the infinite public air outside? The majority circumvents this question, overlooking a focal point of the relevant inquiry: the nature of the place subjected to the dog sniff. After all, whether a dog sniff violates someone's reasonable expectation of privacy depends in large part on the place sniffed-be it a safe in a home, luggage at an airport, a trash can in a public park, a laundry bag in a correctional facility, or the air outside a car during a lawful traffic stop. If focusing solely on the privacy interest in the item that an officer's investigative technique (here, a dog sniff) is aimed at detecting or locating (here, drugs, including marijuana) were sufficient, it would lead to absurd results.
¶87 The majority relies heavily on the U.S. Supreme Court's decision in Caballes (and on our adoption of its rationale in People v. Esparza , 2012 CO 22, 272 P.3d 367 ). But, while Caballes dealt with a dog sniff of the exterior of a car during a lawful traffic stop, it did not have to resolve the question that is front and center in this case because marijuana was illegal in Illinois when Caballes was decided. It sufficed to hold in Caballes that no search had occurred because the dog sniff could have detected only the presence or absence of contraband, and no person can ever have a legitimate expectation of privacy in contraband. That approach cannot dispose of this appeal. The majority nevertheless assumes *421 that, since the Court held in Caballes that the dog sniff was not a search because it could only detect contraband, the Court must have also meant that a dog sniff like the one here, which could detect a drug the majority now views as noncontraband, is a search.
¶88 In place of meaningful analysis regarding whether McKnight had a reasonable expectation of privacy in the public air sniffed by Kilo, the majority analogizes Kilo's sniff to the use of a thermal imager that measures from the street the amount of heat inside a private home, see Kyllo v. United States , 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). The failure to accord these drastically distinct factual scenarios the different treatment they deserve under the Fourth Amendment and article II, section 7 leads the majority astray, eventually declaring that the dog sniff here is as much a search under Katz as the thermal imaging of the home in Kyllo . Kyllo is inapposite for two reasons: (1) a thermal-imaging scanner that detects infrared radiation and converts it into images based on relative warmth can never be confused with a dog's nose; and (2) there is a night-and-day difference between a home and a car.
¶89 To top it all off, the majority seeks cover under the cloak of the Colorado Constitution. But the maneuver fails. While the legalization of marijuana pursuant to Amendment 64 is clearly Colorado-specific, the majority's search-and-seizure analysis is not; rather, it is clearly predicated on U.S. Supreme Court precedent interpreting the Fourth Amendment. The majority does not shepherd a new Colorado-only methodology for determining what constitutes a search. To the contrary, it recognizes that the applicable test is the one ushered in by the Court in Katz , it fastens its rationale to its reading of Caballes , and it analogizes this case to Kyllo . Thus, what is unique to Colorado in this case is the creation of an alleged new privacy interest in the possession of marijuana in limited circumstances-a point I do not contest for purposes of this dissent-not the adoption of a new analytical framework in the search-and-seizure arena or the marshaling of a new constitutional scheme to protect against unreasonable searches and seizures.
¶90 Using the Colorado Constitution as a broom, however, the majority attempts to sweep under the rug the overwhelming authority from other jurisdictions directly contravening its decision. Almost without exception, state and federal courts have held that a driver has no reasonable expectation of privacy in odors that escape from his car and are detected during a dog sniff of the public air outside. And no court has gone against that grain for at least thirty years. In concluding that Kilo's sniff was a search, the majority bucks the trend and places this court on an island. In response, the majority says that this island is one "on which Colorado voters have deposited us," and that "[o]ur role is not to question their decision." Maj. op. ¶ 47. But the finger should not be pointed at Colorado's voters. They were not asked about search-and-seizure issues, much less about dog sniffs, when they voted for Amendment 64.
¶91 Respectfully, I cannot join my colleagues in the majority. Instead, I would conclude that, while a driver in Colorado has a reasonable expectation of privacy in any noncontraband items and "lawful activity" in his car, id. at ¶ 3, he does not have a reasonable expectation of privacy in odors that emanate from those items or activities and escape into the infinite public air outside. Because McKnight had no reasonable expectation of privacy in the public air sniffed by Kilo, Kilo's sniff cannot be deemed a search under the Fourth Amendment or article II, section 7. Thus, even if, as the majority concludes, Amendment 64 created a reasonable expectation of privacy in the possession of up to an ounce of marijuana by anyone who is at least twenty-one in Colorado, I would hold that Kilo's sniff of the odors in the free air outside McKnight's car did not violate the Federal or State Constitutions.
II. Analysis
¶92 At the outset, I note that there is no dispute that McKnight's car was lawfully stopped. The parties also agree that Kilo's sniff did not unreasonably prolong the stop, *422 that Kilo never set paw in McKnight's car, and that Kilo and his handler remained at all times in a public place where they had a lawful right to be. Additionally, it is uncontested that marijuana continues to be contraband under federal law. Given these circumstances, my colleagues in the majority do not appear to contest that Kilo's sniff is not a search under the Fourth Amendment. Id. at ¶ 37.
¶93 The majority nevertheless throws out McKnight's convictions for possession of methamphetamine and paraphernalia because one of the five drugs Kilo was trained to alert to was marijuana, and Amendment 64 legalized the possession of up to an ounce of marijuana by adults who are at least twenty-one. To be clear, McKnight had no marijuana in his car. But because he could have had marijuana in his car, and because it could have been in an amount and under the limited circumstances permitted by state law, the majority concludes that Kilo's sniff intruded upon a reasonable expectation of privacy. Though I fully embrace the Chief Justice's dissent, I do not take issue with this determination for purposes of my dissent. I focus, instead, on what I view as the most glaring flaw in the majority opinion-the lack of meaningful analysis about whether McKnight had a reasonable expectation of privacy in the odors that emanated from noncontraband items or lawful activity in his car and exited into the boundless airspace. After concluding that McKnight did not have a reasonable expectation of privacy in the infinite public air outside his car, I discuss the strained inference the majority draws from Caballes . I then refute the majority's inapt comparison of this case to Kyllo . And I end by demonstrating that, no matter the majority's insistence to the contrary, its decision is rooted in Fourth Amendment jurisprudence-prominently featuring three U.S. Supreme Court cases, Katz , Caballes , and Kyllo -and nothing in the Colorado Constitution can insulate it from attack.
A. There is No Reasonable Expectation of Privacy in an Odor That Escapes from a Car
¶94 Does a driver have a reasonable expectation of privacy (under the Colorado Constitution or any other authority) in an odor emitted by a noncontraband item or lawful activity in his car after it has escaped into the public airspace outside? The majority sidesteps the question and holds instead that a sniff from a drug-detection dog trained to alert to marijuana is a search under article II, section 7 because, following the passage of Amendment 64, "that sniff can detect lawful activity, namely the legal possession of up to one ounce of marijuana by adults twenty-one and older." Id. at ¶ 7. Thus, my colleagues in the majority focus exclusively on the reasonable expectation of privacy in the possession of an ounce or less of marijuana by anyone in Colorado who is at least twenty-one.
¶95 But that cannot be the end of the discussion. Doesn't the place sniffed matter? Doesn't it matter whether a dog sniff occurs inside a home, in an airport, in a public park, in a correctional institution, outside a car, or somewhere else? And, as relevant here, doesn't it matter that Kilo never entered McKnight's car but merely sniffed the public air outside? Without meaningfully considering the place sniffed and whether McKnight had a reasonable expectation of privacy there, we cannot properly discern if Kilo's sniff violated the Fourth Amendment or article II, section 7. Yet, without conducting the required analysis, today's decision prohibits all sniffs in Colorado by dogs with Kilo's training, unless there is probable cause to conduct a search.[1] I undertake here the analysis the majority ignores.
¶96 The jumping-off point is the test articulated by the U.S. Supreme Court in Katz more than fifty years ago to determine whether a search occurred for purposes of the Fourth Amendment-namely, whether the government's activities violated a reasonable expectation of privacy and thus constituted a search within the meaning of the Fourth Amendment.
*423 Katz , 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring).[2] On this, there is no disagreement. See maj. op. ¶ 22. Under Katz , no search occurs for Fourth Amendment purposes unless "the individual manifested a subjective expectation of privacy" that "society [is] willing to recognize ... as reasonable." California v. Ciraolo , 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) ; see also Katz , 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring). In Katz , government agents placed an electronic listening and recording device on the outside of a public telephone booth in order to eavesdrop on Katz's conversations. Katz , 389 U.S. at 348, 88 S.Ct. 507 (majority opinion). The Court held that this was a search because Katz had "justifiably relied" on the privacy of the telephone booth and thus had a reasonable expectation of privacy. Id. at 353, 88 S.Ct. 507.
¶97 Of course, "[w]hat a person knowingly exposes to the public, even in his own home ..., is not a subject of Fourth Amendment protection." Id. at 351, 88 S.Ct. 507 ; see also id. at 361, 88 S.Ct. 507 (Harlan, J., concurring) ("[O]bjects, activities, or statements that [a person] exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited"; conversations in the open, which may be overheard, are not protected either because "the expectation of privacy under the circumstances would be unreasonable."). But Katz did not expose his telephone conversation to the public. To the contrary, he occupied a telephone booth, shut the door behind him, and paid to place a call. Id. at 361, 88 S.Ct. 507 (Harlan, J., concurring). In other words, his phone conversation was intentionally contained within the privacy of the booth. These "critical fact[s]" related to Katz's conduct "surely entitled" him "to assume that his conversation [was] not being intercepted." Id. (internal quotation mark omitted).
¶98 The same cannot be said for anyone who exposes a smell (including from noncontraband items and lawful activity in his car) to the public. Unlike Katz, who "sought to exclude ... the uninvited ear" when he entered the booth and shut the door behind him, id. at 352, 88 S.Ct. 507 (majority opinion), an individual who exposes an odor-producing substance like marijuana to the public air cannot reasonably have intended to exclude the uninvited nose. Certainly that individual has not manifested an expectation of privacy in the public air that society is willing to accept as reasonable. Thus, the fact that a driver may lawfully possesses marijuana in his car pursuant to Colorado law does not mean that he must be deemed to have a reasonable expectation of privacy in the odors that emanate from it and escape into the infinite outside air.
¶99 Two companion cases decided by the U.S. Supreme Court in 1986 are instructive. In the first, Ciraolo , the Court held that naked-eye aerial observations of a backyard from a low-flying airplane do not constitute a search under the Fourth Amendment. 476 U.S. at 215, 106 S.Ct. 1809. The Ciraolo Court emphasized that the challenged observations had taken place "within public navigable airspace" and "in a physically nonintrusive manner," as officers trained in marijuana identification flew over Ciraolo's house in a private plane to observe with their naked eyes what the tall fences he had installed around his backyard blocked from their view. Id. at 213, 106 S.Ct. 1809. Similarly, here, Kilo's sniff took place in the public airspace and in a physically nonintrusive manner. But, importantly, McKnight was in his car, which, as I discuss in more detail later, is significantly less protected by the Fourth Amendment than Ciraolo's home. And there is no evidence that McKnight took any steps exhibiting a subjective *424 expectation of privacy that can be compared to the tall fences installed by Ciraolo to block the public's view of his backyard. True, the case before us does not involve naked-eye observations or, more appropriately, naked-nose ones; rather, it entails an investigative tool that enhances a human sense. But as Dow Chemical Co. v. United States (the second case) illustrates, the U.S. Supreme Court has found that the government's use of certain minimally-intrusive, sense-enhancing techniques does not amount to a search under the Fourth Amendment.
¶100 In Dow Chemical , the Court held that the use of a sophisticated precision mapping camera to obtain enhanced aerial photographs of an industrial complex from lawfully navigable airspace is not a search prohibited by the Fourth Amendment. 476 U.S. 227, 229, 239, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986).[3] The Court acknowledged that the warrantless "surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public, such as satellite technology," may well be unconstitutional. Id. at 238, 106 S.Ct. 1819. But the Court determined that "[t]he mere fact that human vision [was] enhanced somewhat, at least to the degree" involved there, did not "give rise to constitutional problems" because the enhanced photographs, although providing the government much more detailed information than naked-eye views, were "not so revealing of intimate details as to raise constitutional concerns." Id. The Court distinguished the challenged activity from the use of electronic equipment that would penetrate walls or windows and allow the government to hear and record confidential discussions inside the plant regarding chemical formulae or other trade secrets; the latter "would raise very different and far more serious questions." Id. at 239, 106 S.Ct. 1819.[4]
¶101 Just as the magnifying aerial camera in the plane in Dow Chemical allowed officers to discern objects that they could not observe with their naked eyes, Kilo's sniff allowed officers to discern odors in the public air outside McKnight's car that they could not smell with their naked noses. Further, like the technique employed in Dow Chemical , Kilo's sniff took place in lawful airspace and did nothing more than "enhance[ ] somewhat" a human sense-smell instead of sight-without revealing such "intimate details" as to raise constitutional concerns, see id. at 238, 106 S.Ct. 1819. Kilo's alert simply conveyed to his handler that he smelled the odor of at least one of five drugs, including potentially marijuana, in the public air surrounding McKnight's car. This is not the *425 type of intimate detail associated with family privacy and the home that historically has raised constitutional concerns.[5]
¶102 That in some situations only a sniff by a trained narcotics dog could detect the odor of marijuana outside a car is of no moment. Other courts agree. As Judge Lewis T. Babcock explained in United States v. Broadway , "The fact that the smell ... [is] detected by a dog rather than a human does not change its fundamental non-private nature." 580 F. Supp. 2d 1179, 1191 (D. Colo. 2008) ; see also United States v. Roby , 122 F.3d 1120, 1124-25 (8th Cir. 1997) ("The fact that the dog, as odor detector, is more skilled than a human does not render the dog's sniff illegal."); United States v. Goldstein , 635 F.2d 356, 361 (5th Cir. 1981) ("The agents' use of a canine's more enhanced (through training) olfactory sense cannot convert a sniff of the exterior of ... suitcases into a search."). Once the odor of marijuana becomes intermingled with the public airspace, it cannot be deemed private, and anyone who exposes such odor to the public airspace cannot claim to have a reasonable expectation of privacy in it. "Just as evidence in the plain view of officers may be searched without a warrant, evidence in the plain smell may be detected without a warrant." Roby , 122 F.3d at 1125 (internal citation omitted).
¶103 I am concerned that my colleagues in the majority bypass the critical issue related to the location of the sniff, choosing instead to turn a blind eye to the elephant in the room. Equally concerning, the authority on which they lean cannot hold up to scrutiny. Other than the unjustified inference from Caballes and the ill-suited comparison to Kyllo , both of which I address later, the majority relies on: (1) a statement we made thirty-three years ago in People v. Unruh , 713 P.2d 370, 376 (Colo. 1986), abrogated by Esparza , ¶ 11, 272 P.3d at 370, which actually confirms my point : "[A] small minority of courts[ ] have characterized a dog sniff as a search";[6] (2) the concurring opinion in a case from the United States Court of Appeals for the Second Circuit from forty-four years ago, which disagreed with the conclusion that case's majority reached-"that use of a marijuana-sniffing dog to ascertain the contents of a private bag amounts to ... 'plain smell,' " which is "comparable to a 'plain view' " and is not a search, see United States v. Bronstein , 521 F.2d 459, 464 (2d Cir. 1975) (Mansfield, J., concurring); and (3) a passing observation by Justice Souter in a footnote in his dissenting opinion in Caballes . Respectfully, this brittle foundation cannot bear the weight the majority stacks on top of it.
¶104 Significantly, I am by no means alone in concluding that there is no reasonable expectation of privacy in odors in the public airspace that emanate from inside a lawfully stopped car and are detected by a narcotics dog. To the contrary, I am in the company of the great bulk of courts that have addressed this issue. See, e.g., Hearn v. Bd. of Pub. Ed. , 191 F.3d 1329, 1332 (11th Cir. 1999) ("[T]he [U.S.] Constitution does not provide Hearn with any expectation of privacy in the odors emanating from her car."); United States v. Morales-Zamora , 914 F.2d 200, 205 (10th Cir. 1990) ("[W]e find that when the odor of *426 narcotics escapes from the interior of a vehicle, society does not recognize a reasonable privacy interest in the public airspace containing the incriminating odor."); United States v. Corrujedo , No: 5:17-CR-24-RWS-CMC, 2017 WL 8809641, at *18 (E.D. Tex. Dec. 22, 2017) ("Defendants have no privacy interest in the free air around the car when it is detained incident to a traffic stop" and a dog sniff is conducted.); United States v. Holleman , No. CR12-0040, 2012 WL 3779077, at *15 (N.D. Iowa Aug. 30, 2012) ("Defendant had no reasonable expectation of privacy" in the hotel parking lot where a dog sniff was performed on the exterior of his car.); United States v. Cruz , 1:07-cr-145-WSD, 2008 WL 11383985, at *2 (N.D. Ga. May 15, 2008) ("[T]he Fourth Amendment does not protect what a person knowingly exposes to the public. This 'plain view' exception to the Fourth Amendment's general warrant requirement extends to odors emanating from a defendant's vehicle, giving law enforcement officers probable cause to search the vehicle.") (internal citation omitted); United States v. Taylor , 955 F. Supp. 763, 768-69 (E.D. Mich. 1997) (Because the dog sniff was not conducted on any part of the body of any passenger and no entry was made into the interior of the vehicle, "the use of this dog to sniff the air adjacent to the perimeter of this vehicle, as it stood lawfully-and briefly-detained ..., did not constitute a search within the meaning of the Fourth Amendment."); Merrett v. Dempsey , No. TCA 84-7198-WS, 1992 WL 700220, at *8 (N.D. Fla. May 18, 1992) ("Whether vehicles were occupied or not, whether odors emanated from persons [inside] or not, the motorists ... had no expectation of privacy in the airspace surrounding their vehicles."); State v. Bergmann , 633 N.W.2d 328, 334-35 (Iowa 2001) ("[W]e are persuaded by the ... long-standing viewpoint" that a dog sniff of the perimeter of a lawfully-stopped vehicle in a public place does not constitute a search because "the airspace around the car is not an area protected by the Fourth Amendment.") (alteration and quotation omitted); Jackson v. State , 190 Md.App. 497, 988 A.2d 1154, 1159 (2010) ("The dog is as free to smell cocaine or marijuana as the officer is free to smell the roses or the garbage or 'the breath of new mown hay,' " for "[n]either dog nor man needs a judicial permission slip to sniff the air."); State v. Hartzell , 156 Wash.App. 918, 237 P.3d 928, 934 (2010) (agreeing with the trial court that "Hartzell did not have a reasonable expectation of privacy in the air coming from the open window of the vehicle," as he was not in the car "when the dog sniffed from a lawful vantage point outside the vehicle").
¶105 The majority admits that these cases "have come to a different conclusion" than the one it reaches today concerning Kilo's sniff. Maj. op. ¶ 47. However, it asserts that they are inapposite because none of them involved "legalized marijuana." Id. This is a red herring. While those jurisdictions had not passed a law like Amendment 64, none of the decisions turned on that aspect of the law. The cases I cite in the previous paragraph had absolutely nothing to do with the legalization or decriminalization of marijuana or with the contraband/non-contraband distinction. Rather, they all concluded that a person lacks a reasonable expectation of privacy in odors that escape from his car into the public air outside and are detected by a narcotics dog. The majority's point would have been valid if the cases I cite had been resolved based exclusively on the narcotics dog's ability to detect only the presence or absence of contraband.
¶106 The majority likewise observes that in one of the ten cases I cite, Cruz , "the officers already had 'considerable information' that an individual was engaged in illegal narcotics activity," and in another, Corrujedo , "the defendant consented to a hand search of the vehicle that began before a dog was even deployed." Id. at ¶ 47 n.6. Be that as it may, these circumstances in no way affected the determinations that are relevant for our purposes. In Cruz , the court ruled that the "plain view" exception to the warrant requirement includes "odors [that] emanat[e] from a defendant's vehicle," 2008 WL 11383985, at *2, and in Corrujedo , the court found that there is "no privacy interest in the free air" outside a lawfully stopped vehicle, 2017 WL 8809641, at *18. In any event, Cruz and Corrujedo account for only two of the ten cases I cite. And my list of cases is *427 certainly not exhaustive. In fact, as best I can tell, the majority's decision is in conflict with every case during the last three-plus decades that has examined whether a driver has a reasonable expectation of privacy in the odors sniffed by a narcotics dog in the public air outside his lawfully stopped car.[7]
¶107 Perhaps more importantly, the majority fails to cite a single state or federal case that has gone the other way and has held that a driver has a reasonable expectation of privacy in the odors that escape from his car and become part of the public airspace sniffed by a narcotics dog. This speaks volumes about the outlier nature of the majority's decision.
¶108 Courts also routinely conclude that dog sniffs of odors emanating from other spaces do not constitute searches. The majority goes out of its way to note that these cases are distinguishable. Maj. op. ¶ 47, ¶ 47 n.6. These cases are distinguishable, of course; I cite them here simply to show that, even in other factual contexts, courts have been extremely reluctant to conclude that there is a reasonable expectation of privacy in odors floating in the public air. See , e.g. , United States v. Gant , 112 F.3d 239, 241 (6th Cir. 1997) ("A passenger on a common carrier has no reasonable expectation of privacy in the exterior of his luggage or the airspace surrounding it."); Roby , 122 F.3d at 1125 ("Mr. Roby had an expectation of privacy in his Hampton Inn hotel room. But because the corridor outside that room is traversed by many people, his reasonable privacy expectation does not extend so far. Neither those who stroll the corridor nor a sniff dog needs a warrant for such a trip."); United States v. Duarte , No. 94-1234, 1995 WL 296327, at *3 (6th Cir. May 15, 1995) (A dog sniff does not require probable cause because "there is no reasonable expectation of privacy in the airspace surrounding an object."); United States v. Garcia , 42 F.3d 604, 606 (10th Cir. 1994) (upholding a dog sniff of Garcia's luggage in the baggage car of an Amtrak train because Garcia's reasonable expectation that the contents of his luggage would not be exposed in the absence of consent or a search warrant "did not extend to the air surrounding the luggage"); United States v. Harvey , 961 F.2d 1361, 1363 (8th Cir. 1992) (The defendants had "no reasonable expectation of privacy in the ambient air surrounding their luggage," which was "all that Jupp invaded."); Goldstein , 635 F.2d at 361 ("[T]he passenger's reasonable expectation of privacy" in the contents of her luggage "does not extend to the airspace surrounding that luggage."); United States v. Lucas , 338 F. Supp. 3d 139, 165 (W.D.N.Y. 2018) (joining other circuits in concluding that "no expectation of privacy to the common area outside the [storage] locker would be reasonable"); Khachatourian v. Hacienda La Puente Unified School Dist., No. CV 10-08436 SJO (RZx), 2012 WL 12877986, at *9 (C.D. Cal. Jan. 24, 2012) ("Even if he had a reasonable expectation of privacy in the contents of the counter drawers, Plaintiff had no expectation of privacy in the smell of the air around the counter."); Broadway , 580 F. Supp. 2d at 1191 ("A dog ... does not detect anything inside a home, but merely detects the particulate odors that have escaped from a home," and such odors "are no longer 'private,' but instead are intermingled with 'the public airspace containing the incriminating odor.' ") (quoting Morales-Zamora , 914 F.2d at 205 ).
¶109 Rather than join the great weight of authority, the majority charts an unfamiliar course by drawing an unwarranted inference from the U.S. Supreme Court's decision in Caballes . I turn my attention to this questionable aspect of the majority opinion next.
B. The Inference the Majority Draws from Illinois v. Caballes is Unwarranted
¶110 To place Caballes in context, I must first discuss its predecessor, United States v. Place , 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), another Fourth Amendment case from the U.S. Supreme Court discussed by the majority. In Place , after recognizing that a person has a privacy interest in the contents of personal luggage, the Court held that a dog sniff of the outside of *428 the luggage did not violate the Fourth Amendment. 462 U.S. at 707, 103 S.Ct. 2637. The Court explained that a dog sniff is "sui generis ," or unique, for two reasons: (1) "the manner in which information is obtained" through a dog sniff "is much less intrusive than a typical search," as it "does not require opening the luggage" and it "ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods";[8] and (2) a dog sniff "discloses only the presence or absence of narcotics, a contraband item," and there is no legitimate expectation of privacy in contraband items. Id.
¶111 Close to twenty years later, when confronted with a dog sniff of the exterior of a car in Caballes , the Court affirmed Place -but only found it necessary to rely on the second part of its rationale: "[A]ny interest in possessing contraband cannot be deemed 'legitimate' " and thus a dog sniff that only detects the presence or absence of contraband is not a search under the Fourth Amendment. 543 U.S. at 408, 125 S.Ct. 834. If this holding by the U.S. Supreme Court sounds familiar, it should: it serves as the blueprint for the majority's decision.
¶112 Importantly, the Caballes Court did not disavow the first part of Place 's rationale. The other traits of a dog sniff-that it is limited in scope, minimally intrusive, very fast, and unlikely to cause embarrassment or inconvenience-remain true after Caballes (especially when the sniff involves the public air outside a car). As well, the Court's view of a dog sniff as sui generis , predicated in part on those traits, has not changed. Yet, the majority infers the opposite. It presupposes that, but for the second rationale set forth in Place , the Caballes Court would have concluded that a dog sniff of the exterior of a car constitutes a search. In other words, according to the majority, since the Court held in Caballes that the dog sniff was not a search because it could only detect contraband, the Court must have also meant that a dog sniff like the one here, which could detect a drug the majority now views as noncontraband, must necessarily be a search. See maj. op. ¶ 27. But the reality is that the Court did not have to address the question we confront today because the dog in Caballes could only detect contraband. I am not comfortable making the leap the majority does. Instead, I would apply the Katz test to determine whether McKnight had a reasonable expectation of privacy in the odors floating in the air sniffed by Kilo.
¶113 Not only is the majority's reading of Caballes inconsistent with Katz , it also risks undesirable, if not absurd, results because there is no way to place parameters around an expectation of privacy in the limitless public airspace. What if Kilo had been trained to detect the odor of narcotics while walking a few feet away from McKnight's car? Would that still be a search requiring probable cause? What if the distance had been five or ten feet? What if Kilo had remained in the patrol car during the sniff? Does the majority believe that Amendment 64 gave McKnight a legitimate expectation of privacy in all of the infinite air outside his car? Rather than answer these questions or at least address whether McKnight had a reasonable expectation of privacy in the odors that escaped from his car into the endless public air outside, the majority analogizes Kilo's sniff to the thermal imager used in Kyllo . Id. at ¶ 44 (citing Kyllo , 533 U.S. at 40, 121 S.Ct. 2038 ). But, as I demonstrate next, Kyllo cannot carry the day for the majority.
C. The Majority Erroneously Analogizes this Case to Kyllo
¶114 The majority's suspect analogy to Kyllo falls flat. A dog sniff is nothing like a *429 thermal-imaging scanner that detects infrared radiation and converts it into images based on relative warmth. More importantly, there is a world of difference in the Fourth Amendment arena between obtaining information about the interior of Kyllo's home, including potentially "at what hour each night the lady of the house takes her daily sauna and bath," Kyllo , 533 U.S. at 38, 121 S.Ct. 2038, and obtaining information about any odors emitted by the noncontraband contents and lawful activities in McKnight's car after they have escaped into the public air outside during a lawful traffic stop.
1. A Dog Sniff Can Never Be Confused With a Thermal Imager
¶115 As relevant here, the majority stumbles out of the gate when it likens Kilo to a thermal-imaging scanner.[9] Maj. op. ¶¶ 44-46. Kilo is not a robot or the product of a laboratory experiment. Nor does Kilo function on technology. Kilo is a dog-a living, walking, sniffing animal. That Kilo has been trained to detect the smell of five drugs with his nose does not make him technology-like.
¶116 Certainly "a drug sniffing dog is not 'technology' of the type addressed in Kyllo ." Bergmann , 633 N.W.2d at 334 ; see also Duarte , 1995 WL 296327, at *3 ("[T]he use of a dog to detect the odor of contraband is not analogous to the use of binoculars or magnifying devices to observe objects or activities not exposed to public view."). Indeed "a dog's sense of smell, while more acute than a human's, does not compare to a technology that can turn minute gradations in temperature into video tapes from 1500 feet away." United States v. Ishmael , 843 F. Supp. 205, 213 (E.D. Tex. 1994), rev'd on other grounds , 48 F.3d 850 (5th Cir. 1995). " Kyllo specifically speaks to highly advanced technology that is not readily available to the general public," which is used to gain access to details inside a home that would be "unknowable without physical intrusion." Bergmann , 633 N.W.2d at 334 (citation omitted). Contrary to what the majority implies, "It cannot seriously be argued that a dog can explore 'details of the home' that would 'previously have been unknowable' without physical intrusion." Broadway , 580 F. Supp. 2d at 1191 (quoting Kyllo , 533 U.S. at 40, 121 S.Ct. 2038 ). "To the extent a dog can detect a scent, ... it does not detect anything that 'would have been unknowable' without physical intrusion when the Fourth Amendment was adopted in 1791." Id. (quoting Kyllo , 533 U.S. at 40, 121 S.Ct. 2038 ).
2. For Fourth Amendment Purposes, There Is No Place Like Home
¶117 The majority acknowledges that the holding in Kyllo hinged in part on the fact that the challenged search was of a home, not a car. Maj. op. ¶ 45. Yet, in the next breath, it seemingly robs that difference of any meaning and adopts a one-size-fits-all expectation-of-privacy standard for homes and cars by relying on Kyllo just the same. See id. If, as the majority admits, the Fourth Amendment offers a home heightened protection, Kyllo 's rationale cannot apply with equal force in the context of a car. Unlike the majority, I readily recognize that this case cannot be shoehorned under the Kyllo umbrella. Consequently, I attempt to do justice to the crystal-clear distinction the U.S. Supreme Court has consistently drawn in the Fourth Amendment framework between the home and other places.
¶118 The right of a person "to retreat into his own home and there be free from unreasonable governmental intrusion" is at the heart of the Fourth Amendment. Silverman v. United States , 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). "[W]hen it comes to the Fourth Amendment, the home is first among equals." Jardines , 569 U.S. at 6, 133 S.Ct. 1409. The greater expectation of privacy in the interior of a home is moored in "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." Payton v. New York , 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Indeed, physical intrusion into the home "is the chief evil *430 against which the ... Fourth Amendment is directed." United States v. U.S. Dist. Ct. , 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Because the home is the most sacred of Fourth Amendment spaces, with few exceptions, a warrantless search of a home is unreasonable and unconstitutional. See Jardines , 569 U.S. at 6, 133 S.Ct. 1409 ; Kentucky v. King , 563 U.S. 452, 474, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) (Ginsburg, J., dissenting) ("In no quarter does the Fourth Amendment apply with greater force than in our homes, our most private space which, for centuries, has been regarded as 'entitled to special protection.' ") (quoting Georgia v. Randolph , 547 U.S. 103, 115, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) ).
¶119 In Kyllo , the Court reiterated the unique protection afforded the interior of a home by the Fourth Amendment. It was in part on this basis that the Court rejected the prosecution's argument "that the thermal imaging was constitutional because it did not 'detect private activities' " in any private areas:
The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. In Silverman, for example, we made clear that any physical invasion of the structure of the home, "by even a fraction of an inch," was too much , and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor. In the home, our cases show, all details are intimate details, because the entire area is held safe from prying government eyes.
Kyllo , 533 U.S. at 37, 121 S.Ct. 2038 (emphases added except as to the word "all") (internal citation omitted). Inasmuch as the temperature inside Kyllo's residence was a detail of the home, it was an intimate one as to which he had a reasonable expectation of privacy. Id. at 38, 121 S.Ct. 2038. So long as the detail learned through the highly-advanced technological device used was one "that would previously have been unknowable without physical intrusion, the surveillance [was] a 'search' and [was] presumptively unreasonable without a warrant." Id. at 40, 121 S.Ct. 2038.
¶120 Conversely, the U.S. Supreme Court has recognized that "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." South Dakota v. Opperman , 428 U.S. 364, 367, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (emphasis added); see also Morales-Zamora , 914 F.2d at 205 (indicating in a dog sniff case that "there is a lesser expectation of privacy in a vehicle than in a home"). In fact, the Court has acknowledged that "since the beginning of the government" there has been "a necessary difference between a search of a ... house ... and a search of a ship, motor boat, wagon, or automobile." Carroll v. United States , 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Our court has likewise observed that there is a diminished expectation of privacy in automobiles. People v. Litchfield , 918 P.2d 1099, 1103 (Colo. 1996).
¶121 Because the majority fails to give effect to the substantial differences between this case and Kyllo , its analogy of the dog sniff here to the thermal imager there misses the mark. Perhaps concerned with the vulnerability of this comparison and the unreasonable inference it draws from Caballes , the majority attempts to use our State Constitution as a bulwark for its decision. But, as I address next, its efforts are for naught.
D. The Majority's Decision is Clearly Grounded in Fourth Amendment Jurisprudence
¶122 Despite relying almost exclusively on U.S. Supreme Court precedent applying the Fourth Amendment for its analysis, the majority attempts to shelter its decision in the Colorado Constitution: "[W]e rest our holding on the Colorado Constitution, not on the Fourth Amendment." Maj. op. ¶ 47. At the end of its opinion, the majority doubles down on this proclamation and goes so far as to take the unusual step of issuing a disclaimer: "This holding is based solely on the protections afforded by our state constitution, and to the extent we discuss any federal cases in coming to our conclusion, it is only for the purpose of analogy and comparison."
*431 Id. at ¶ 63. Indeed, by relying on its Colorado-only justification, the majority dismisses the lion's share of federal and state cases that have concluded there is no reasonable expectation of privacy in odors in the public air outside a car that are sniffed by a narcotics dog, even if they may have originated inside the car. See id. at ¶ 47. The majority's own opinion undercuts its Colorado-only claim.
¶123 Respectfully, because the majority hitched its wagon to Fourth Amendment jurisprudence, it cannot seek to barricade its opinion behind the mantle of the Colorado Constitution. That the majority finds it necessary to attempt to convince us that its discussion of any federal authority (the authority on which it principally leans) is strictly "for the purpose of analogy and comparison" is telling. Id. at ¶ 63.
¶124 The majority appears to conflate two different concepts: (1) the creation through a state constitutional amendment of a privacy interest in the possession of marijuana under certain limited circumstances; and (2) the analytical framework to determine what constitutes a search when that privacy interest is involved. I try to unravel any confusion that may exist.
¶125 In the past this court has interpreted the Colorado Constitution to protect certain privacy interests beyond those protected by the Fourth Amendment. See People v. Corr , 682 P.2d 20, 27-28 (Colo. 1984) (telephone toll records); People v. Sporleder , 666 P.2d 135, 140-41 (Colo. 1983) (outgoing calls monitored by pen registers); Charnes v. DiGiacomo , 200 Colo. 94, 612 P.2d 1117, 1119-21 (1980) (bank transactions recorded by bank personnel). For purposes of this dissent, I am not disputing that Amendment 64 created a new privacy interest in the possession of marijuana under limited circumstances in Colorado and that this privacy interest does not exist under federal law. See maj. op. ¶ 42. In fact, for purposes of this dissent, I do not even take issue with the majority's curious conclusion that "Amendment 64 expanded the protections of article II, section 7" to provide this new reasonable expectation of privacy "in the lawful activity of possessing marijuana in Colorado." Id.
¶126 The issue I address in this dissent is whether, given the majority's finding that McKnight had a reasonable expectation of privacy under the Colorado Constitution in the possession of up to an ounce of marijuana , officers violated his state constitutional right to be free from unreasonable searches and seizures by having Kilo sniff the air outside his car. Resolution of this question requires us to determine whether Kilo's sniff is a search-and a search is defined the same way under article II, section 7 as it is under the Fourth Amendment. It is revealing that in addressing the question, the majority essentially relies on three cases, Katz , Caballes , and Kyllo , all of which are U.S. Supreme Court cases interpreting and applying the Fourth Amendment. And, to the extent the majority also relies on Colorado precedent in Esparza , it does so only because we adopted the analytical framework and rationale in Caballes there. Indeed, as the majority concedes, " Esparza ... represented a kind of return [for this court] to the federal fold."[10] Id. at ¶ 34.
*432 ¶127 The majority cites Michigan v. Long , 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), to justify its disclaimer. But that case is inapposite. While today's opinion certainly "appears to rest primarily on federal law, or to be interwoven with the federal law," there is not "an adequate and independent state ground" to support it. Id. at 1040, 103 S.Ct. 3469. Despite its self-serving characterization of today's decision as embedded exclusively in Colorado law, the majority can point to no "bona fide separate, adequate, and independent [state] grounds" underpinning it. Id. at 1041, 103 S.Ct. 3469. The majority's conclusion that the possession of up to one ounce of marijuana by adults who are at least twenty-one is now protected in Colorado by article II, section 7 cannot do the trick because this provision does not (and cannot) resolve whether Kilo's sniff was a search . There are simply no grounds to allow the majority to tuck its opinion in the protective fold of our State Constitution.
¶128 In short, the majority predominantly relies on Fourth Amendment U.S. Supreme Court jurisprudence in applying Colorado's search-and-seizure constitutional provision. As such, its decision is tethered to Fourth Amendment U.S. Supreme Court jurisprudence, not search-and-seizure case law unique to Colorado. The majority cannot undo this reality with a disclaimer.
III. Conclusion
¶129 I recognize that the United States Supreme Court has not addressed whether, following the passage of a state law like Amendment 64, a driver has a reasonable expectation of privacy in odors that emanate from inside his car and are detected in the public air outside by a narcotics dog with Kilo's training. But considering the advent of the decriminalization and legalization of marijuana in a growing number of states, see maj. op. ¶ 47, I believe that the issue has taken on a new level of relevance. The approach in Caballes no longer suffices. Despite Caballes , state laws decriminalizing or legalizing marijuana can be interpreted so as to render all sniffs by dogs with Kilo's training categorically unlawful. The majority opinion illustrates the point. To my mind, the marijuana sea change requires a recalibration of the balance struck in Caballes between the needs of law enforcement and the interests protected by the Fourth Amendment. This is certainly not a Colorado-specific issue because the majority's search-and-seizure analysis takes root in Fourth Amendment jurisprudence-and specifically in U.S. Supreme Court precedent.
¶130 In the end, I worry that today's decision unnecessarily upsets the applecart. For the reasons articulated here and in the Chief Justice's compelling dissent, I believe that the court of appeals erred. Therefore, I would reverse its judgment. Accordingly, I respectfully dissent.
I am authorized to state that JUSTICE BOATRIGHT joins in this dissent.

By requiring probable cause, a standard neither party advocated for in this case, the majority sua sponte renders sniffs by dogs trained to detect marijuana largely obsolete. In most cases, there will be no need for a dog sniff if officers already possess probable cause to conduct a hand search.

The reasonable-expectation-of-privacy analysis in Katz makes clear that "property rights 'are not the sole measure of Fourth Amendment violations.' " Florida v. Jardines , 569 U.S. 1, 5, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) (quoting Soldal v. Cook Cty. , 506 U.S. 56, 64, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) ). But, while "Katz may add to the baseline, it does not subtract anything from the Amendment's protections 'when the Government does engage in [a] physical intrusion of a constitutionally protected area.' " Id. (quoting United States v. Knotts , 460 U.S. 276, 286, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (Brennan, J., concurring in the judgment only) (alteration in original). Here, there is no allegation that McKnight's property rights were violated or that the police physically invaded a constitutionally protected area.

The Dow Chemical Court appeared to downplay the technology employed by the government: "Any person with an airplane and an aerial camera could readily duplicate" the photographs taken. 476 U.S. at 231, 106 S.Ct. 1819. Even overlooking the very real challenge for "[a]ny person" to obtain and fly an airplane, the aircraft used was of a specific type that enabled it "to provide photographic stability, fast mobility and flight endurance required for precision photography." Id. at 242 n.4, 106 S.Ct. 1819 (Powell, J., concurring in part and dissenting in part) (quotation omitted). Additionally, the camera used "cost in excess of $ 22,000.00" in the 1980s and was described by its manufacturer "as the finest precision aerial camera available." Id. (quotation omitted). It was "mounted to the floor inside the aircraft and was capable of taking several photographs in precise and rapid succession," a technique which "facilitate[d] stereoscopic examination" and "permit[ted] depth perception." Id. (quotation omitted). And some of the photographs were "capable of enlargement to a scale of 1 inch equals 20 feet or greater, without significant loss of detail or resolution," thereby making it "possible to discern equipment, pipes, and power lines as small as ½ inch in diameter." Id. at 243, 106 S.Ct. 1819 (emphasis and quotation omitted). In short, the camera mounted in the airplane "saw a great deal more than the human eye could ever see , even if the observer was located directly above the facility." Id. (emphasis added and quotation omitted).

The majority cites Dow Chemical for the proposition that "a person surely engages in more 'intimate activities' in the solitary confines of his car as compared to the 'outdoor areas or spaces between buildings of a manufacturing plant.' " Maj. op. ¶ 45 (quoting Dow Chemical , 476 U.S. at 236, 106 S.Ct. 1819 ). Nowhere in Dow Chemical did the Court discuss or even mention automobiles. Rather, the Court unsurprisingly rejected the government's contention that the protection afforded the curtilage area immediately surrounding a home applied with equal force to the open areas surrounding the buildings in an industrial plant complex. 476 U.S. at 236-39, 106 S.Ct. 1819.

The majority compares this case to Katz , arguing that Kilo has spent "countless hours" in training to detect the odor of marijuana and "can even alert" to a substance inside a car contained in a box that is closed and "sealed off with duct tape." Maj. op. ¶ 46. But this case is actually more like Dow Chemical than Katz . In Katz , the government used an electronic device to listen in on a private conversation that may well have included the types of intimate details warranting Fourth Amendment protection. 389 U.S. at 348, 88 S.Ct. 507. Consistent with Katz , in Dow Chemical , the Court cautioned that, had the government used electronic equipment to listen in on conversations inside the plant that may well have included confidential details, its conduct would have raised "far more serious questions." 476 U.S. at 239, 106 S.Ct. 1819. Here, the government used a narcotics dog to sniff odors floating in the public air outside a lawfully stopped vehicle. This is akin to the government's use of a sense-enhancing, high-tech camera mounted inside a specialized airplane flown in public, navigable airspace to observe things outside the buildings of an industrial plant that could not be discerned with the naked eye.

All seven of the cases cited in Unruh in support of the quoted proposition are from more than thirty years ago; more importantly, one was vacated, another was overruled, and two were subsequently called into doubt. 713 P.2d at 376 n.9. Two additional cases involved dog sniffs of "the persons of school students" and are distinguishable. Id. (emphasis added).

By and large, the rare cases that long ago concluded that there was an expectation of privacy in odors floating around in the public airspace have been overruled.

The Court in Place noted that a dog sniff is more "limited" in the manner it obtains information than any other police investigative procedure. 462 U.S. at 707, 103 S.Ct. 2637. Surprisingly, today the majority expresses second thoughts about our adoption of that view years ago and conveniently ponders whether "[w]e may have overstated the 'minimally intrusive' nature" of a dog sniff in our past cases. Maj. op. ¶ 54 n.7 (relying on Justice Ginsburg's argument in her dissent in Caballes that a drug-detection dog is "an intimidating animal"). I decline to join the majority's attempt to revise our case law without considering or even mentioning stare decisis principles. People v. Kutlak, 2016 CO 1, ¶ 18, 364 P.3d 199, 205 (principles of stare decisis "require this court to follow the rule of law" established in our prior cases unless sound reasons exist for departing therefrom).

In Caballes , the Court distinguished a dog sniff from the sense-enhancing technology involved in Kyllo on the ground that a narcotics dog is trained to alert only to the presence of contraband. 543 U.S. at 408-10, 125 S.Ct. 834. But the Court did not say that this was the only distinction that exists. Rather, that was a distinction relevant to its analysis.

I adamantly disagree with the majority's portrayal of our holdings in People v. Cox , 2017 CO 8, 401 P.3d 509, and People v. Zuniga , 2016 CO 52, 372 P.3d 1052, which were decided after Esparza . To begin, the majority quotes Zuniga out of context and asserts that we said there that, "[a]t most, [an] alert could be 'suggestive of criminality,' but not determinative on its own." Maj. op. ¶ 36 (quoting Zuniga , ¶ 23, 372 P.3d at 1059 ). What we actually said is that "a possible ... explanation ... does not wholly eliminate [a] fact's worth and require it to be disregarded" for purposes of a probable cause determination, and since "a substantial number of ... marijuana-related activities remain unlawful" after the passage of Amendment 64, "the odor of marijuana is still suggestive of criminal activity." Zuniga , ¶ 23, 372 P.3d at 1059 (emphasis added); see also Mendez v. People , 986 P.2d 275, 281 n.4 (Colo. 1999) (explaining that the possibility that the defendant was lawfully burning marijuana for medical purposes was irrelevant because "the Constitution has never required an officer to refrain from searching premises under circumstances in which the activity in question could potentially be legal"; "the smell of burning marijuana," though possibly legal, may nevertheless provide probable cause because it "gives rise to a very high probability that the search of a particular place will reveal contraband or evidence of a crime"). Undeterred, the majority insists that Cox and Zuniga "suggest[ed]" that "a positive alert from a dog trained to detect marijuana" alone is insufficient to "establish probable cause." Maj. op. ¶ 36. The majority goes too far. Cox and Zuniga did no such thing. Nor did either case "represent a tentative step away from the federal approach," id. -whatever that may mean. The reason there was a "need to evaluate other circumstances," in each case, id. ,is because we expressly declined to address the question of whether a dog alert is sufficient to establish probable cause. See Cox , ¶ 22 n.5, 401 P.3d at 514 ("As in Zuniga , ... we need not consider whether the dog alert alone would establish probable cause in this case."); Zuniga , ¶ 30 n.6, 372 P.3d at 1060 ("[W]e need not and do not reach the People's alternative argument that the dog alert alone establishes probable cause in this case."). Because we explicitly left the question for another day in both cases, we had no choice but to consider all of the circumstances present in each case to determine whether there was probable cause. Moreover, as the majority acknowledges, the probable cause standard always "requires judges to consider the totality of the circumstances." Maj. op. ¶ 51. Regardless, I think it is unwise for us to look back at our cases and attempt to divine what we may have intended to suggest or imply. If we did not say it, we did not mean it.